## Staunton

### CHARLES F. THOMPSON, MARSHALL F. THOMPSON AND INTERNATIONAL ROLL-CALL CORPORATION v. COMMONWEALTH OF VIRGINIA.

September 14, 1955.

Record No. 4363.

Present, All the Justices.

The opinion states the case.

*Allen, Allen, Allen & Allen,* for the appellants.

*J. Lindsay Almond, Jr., Attorney General* and *Kenneth C. Patty, Assistant Attorney General,* for the Commonwealth.

SMITH, J., delivered the opinion of the court.

On May 16, 1950 the Commonwealth of Virginia filed this suit against Charles F. Thompson, Marshall F. Thompson and International Roll-Call Corporation,. formerly the International Roll-Call System, Incorporated, defendants, for the purpose of obtaining a decree of specific performance of a contract between the parties dated May 23, 1945, wherein the defendants agreed to "prepare, build, construct, and deliver" certain electrical units for the Commonwealth. This contract was made for the purpose of settling a dispute between the parties arising out of earlier dealings with respect to electrical voting systems installed by Charles F. Thompson for the House of Delegates and the Senate of Virginia in their respective chambers.

Beginning with the installation of the first voting machine in the Capitol (Acts 1924, p. 475, c. 313) by the Thompson Voting Machine Company and for a number of years thereafter, Charles F. Thompson was employed by the Commonwealth, at first only during the sessions of the General Assembly but after a few years on a full time basis, and charged with the responsibility of maintaining the electrical voting systems then installed in the Capitol. This arrangement continued until 1942 when he left the employment of the Commonwealth. However, until 1948 he continued to occupy, without the payment of rent, a work shop in the State Office Building, in which he commingled his own hand and machine tools with those of the Commonwealth, and when he was not engaged in state business he used the shop to develop improvements in electrical voting systems and to manufacture and sell this electrical equipment to the public.

By 1936 Charles F. Thompson had perfected such improvements in electrical voting systems that the General Assembly enacted a statute, Acts 1936, p. 489, c. 303, authorizing the installation of his

new system in the Capitol, and Charles F. Thompson entered into a contract with the Commonwealth as contemplated by the statute. During the installation of this system, which was completed in late 1942, a dispute arose under the 1936 act and contract concerning the ownership of certain property in the work shop in the State Office Building. For the purposes of settling this dispute the General Assembly enacted Acts 1942, p. 746, c. 471, under which the parties were unable to reach an agreement. Consequently, the General Assembly enacted Acts 1944, p. 498, c. 342, pursuant to which the parties on May 23, 1945 executed the contract now before us. In addition to certain enumerated obligations on the part of defendants which they have complied with, the contract required that they "prepare, build, construct, and deliver to the Clerks of the Senate and House of Delegates of Virginia * * * on or before December 1, 1945, two (2) complete spare recorder units without cases, and two (2) complete spare high speed vote counters; it being understood that both the recorder units and counter units are to be of the same model and type now in use in the voting systems in the Senate and House of Delegates."

In their answer the defendants alleged (1) that the contract was not made in accordance with or pursuant to Chapter 342 of the Acts of 1944, (2) that there was no contract because of a lack of consideration and (3) that to require the defendants to comply with the contract would create an unconscionable hardship. Thereafter, by stipulation the issues were defined as follows:

"1. Is the contract sued upon within the scope of the legislative authority contained in Chapter 342, Acts of 1944, General Assembly of Virginia?

"2. If the contract was authorized by said Act, will specific performance be decreed to the complainant for the delivery by the defendants to the complainant of the two (2) complete spare recorder units without cases, and two (2) complete spare high speed vote counters mentioned in the contract between the parties involved in this cause?"

After due consideration of the pleadings, depositions, exhibits, oral argument and memoranda filed by counsel, the trial court in its decree ordered that the defendants, "prepare, build, construct and deliver to the Clerks of the Senate and House of Delegates of Virginia two (2) complete spare recorder units without cases and two (2) complete spare high speed vote counters" mentioned in the

contract between the parties dated May 23, 1945. To review this decree we awarded defendants this appeal.

While defendants list 15 Assignments of Error and 6 Questions Presented in their brief, there is no allegation in the pleadings or questions raised in the brief that there is any ambiguity or doubt as to what they agreed to do under the terms of the contract. Only those questions relating to the stipulation of issues set forth above are properly before this court.

Defendants devote a great portion of their brief to the contention that the contract of May 23, 1945 was procured by unfair, inequitable and overreaching conduct on the part of certain State officials who were charged with the duty and responsibility of executing the provisions of the Act of 1944. It would serve no useful purpose to relate here in detail the evidence and arguments submitted in support of this contention. Suffice it to say that we have carefully examined this contention and the evidence introduced to support it with a great deal of interest and concern and have found it wholly without merit.

The first question stated in the stipulation of issues is whether the contract of May 23, 1945, was within the scope of the legislative authority contained in Chapter 342, Acts of 1944, which reads in part as follows:

"That the Clerk of the Senate and the Clerk of the House of Delegates are hereby authorized and empowered on behalf of the Commonwealth of Virginia to enter into a contract or contracts with Charles F. Thompson or his assigns to accomplish any one or more of the following purposes:

"(a) A final settlement of the differences now existing with respect to what machines, tools, dies, and other articles of personal property shall be turned over to said Charles F. Thompson or his assigns, and the rights, if any, of the Commonwealth to use the same after being so delivered or turned over, and the delivery by said Clerks of said property pursuant to said settlement."

The differences referred to in this Act of the General Assembly arose when Charles F. Thompson claimed the sole ownership and the right of removal of all equipment in the machine shop in the State Office Building, allegedly pursuant to the provisions of Chapter 303 of the Acts of 1936. The Commonwealth disputed this claim. In addition, the Commonwealth was concerned over possible future difficulties with respect to its patent rights acquired in

1936 by license from Charles F. Thompson. Inasmuch as some of the component parts of the electrical voting systems were not protected by patents, the Commonwealth was seeking some method of protecting its interests. This aspect of the dispute is stated in a letter dated February 4, 1941, from the Clerk of the House of Delegates to Charles F. Thompson, which reads in part: "I am concerned in preserving all parts that we have a right to use under the original installation, in the event that any trouble should arise in connection with the patent rights that were not involved in your patent litigation * * *."

This being the controversy, a contract calling for the manufacture and delivery of spare parts to the Commonwealth and delivery of all equipment in the machine shop to the Thompsons was obviously an appropriate method of settling the differences between the parties. Moreover, the contract of May 23, 1945 shows on its face that it was within the scope of the legislative authority contained in Chapter 342, Acts of 1944.

There is likewise no merit in the contention that the defendants "were under no valid and binding obligation under the alleged contract of May 23, 1945, because there was no sufficient and valid consideration moving to the defendants." In addition to the clear and definite recitals in the contract as to consideration, the contract was executed for the purpose of settling a dispute or controversy between the parties. *Zane* v. *Zane*, 6 Munf. (20 Va.) 406; *Eggleston* v. *Crump*, 150 Va. 414, 143 S. E. 688; *Weade* v. *Weade*, 153 Va. 540, 150 S. E. 238. "A compromise usually involves an act of favor or concession by each of the parties. The favor or concession received by one is the consideration for the favor or concession granted the other." *Cawley* v. *Hanes*, 173 Va. 381, 390, 4 S. E. (2d) 376. Thus the defendants having confirmed the contract by partially performing their obligations and by accepting the privilege of continuing to occupy the premises furnished by the Commonwealth for approximately three years after the contract was executed may not now avoid their further obligations on the ground that there was no sufficient and valid consideration moving to them.

The remaining question is whether a court of equity may properly decree specific performance of this contract. In general, equity will grant specific performance of a contract when the remedy at law is inadequate and the nature of the contract is such

that specific enforcement of it will not involve too great practical difficulties. Accordingly, contracts for the sale of personal property are not normally enforced specifically because the remedy at law is generally adequate. "While the doctrine is well established that a court of equity will not, in general, decree the specific performance of contracts relating to chattels, yet it will do so where the remedy at law is inadequate to meet all the requirements of a given case, and to do complete justice between the parties." *Stuart* v. *Pennis*, 91 Va. 688, 692, 22 S. E. 509, 510. Thus where the chattel which is the subject of the contract is unique or not purchasable in the market, equity will decree specific performance. Indeed, "The modern disposition is to be less technical in the application of this principle, and where a special need on the part of the plaintiff, and at least a temporary monopoly on the part of the defendant, justify its application, the remedy is allowed for breach of contracts for the sale of personal property for which damages might otherwise be adequate." 5 Williston, Contracts, rev. ed., § 1419, pp. 3954, 3955. *Southern Express Co.* v. *Western N. C. Railroad*, 99 U. S. 191, 25 L. ed. 319; *Kann* v. *Wausau Abrasives Co.*, 81 N. H. 535, 129 A. 374. See also, 17 Michie's Jur., Specific Performance, § 63, p. 97; Pomeroy's Specific Performance of Contracts, 3rd ed., § 15, p. 41.

A case directly in point on the issue under discussion is *Adams* v. *Messinger*, 147 Mass. 185, 17 N. E. 491, where plaintiff sought specific performance of a contract in which the defendant had contracted to furnish and deliver certain steam-injectors which were patented. The court in overruling defendant's demurrer to the bill said:

"The defendant has agreed to furnish and deliver certain injectors, which the contract shows to be patented articles. It does not appear from the bill that they were yet to be made when the contract was executed. But if it be assumed that they were, there is nothing from which it can be inferred that any skill peculiar to the defendant was required to construct them. For aught that appears, they could be made by any intelligent artificer in the metals of which they are composed. The details of their manufacture are given by reference to the patents which are referred to in the agreement, so that no difficulty such as has sometimes been experienced could have been found in describing accurately, and even minutely, the articles to be furnished." 147 Mass., at pages 189, 190.

While the defendants allege in their answer that the Commonwealth "cannot go into the market and purchase" the equipment

sued for, in their brief they admit that "any first class machine shop, of which there are several around Richmond, can build the counters and recorders, as well as the defendants can." Hence both the *Adams* case, *supra*, and the instant case were brought to compel specific performance of contracts involving personal property which was not readily available on the open market but the manufacture of which did not require any extraordinary or unique skill or knowledge. Thus the question presented is whether the remedy at law is adequate where the Commonwealth, after receiving a money judgment, must take the responsibility of finding a first class machine shop which could, without original plans and specifications, manufacture the required equipment from an examination of similar equipment items with which it has had no prior experience.

If there were several machine shops experienced in manufacturing electrical voting equipment from which the Commonwealth could in the ordinary course of business order the equipment, then the remedy at law would be adequate and specific performance would not be granted. However, there are no other experienced manufacturers of such equipment as testified to by Marshall F. Thompson as follows: "I do not think there is any other corporation today that builds spare counters and spare recorders for roll call systems except International Roll Call Corporation * * *." Thus if specific performance were denied, the Commonwealth would have to assume the responsibility and risk which properly belong to defendants. If anyone is to search for a manufacturer it should be defendants and not the Commonwealth.

The defendants contend, however, that "the uncontradicted evidence shows that the chattels which it is sought to force these defendants to build, construct and deliver under a decree of specific enforcement would require the personal attention and labor of two of your defendants for many months and therefore would place them in a position tantamount to involuntary servitude." It is generally true that "courts of equity will not entertain suits to enforce specifically contracts for personal services, or acts involving skill, labor and judgment." 17 Michie's Jur., Specific Performance, § 66, p. 101. But there is no need to apply that principle here or to determine whether the facts of this case fall under any exceptions to the general rule. Defendants have said that "any first class machine shop * * * can build the counters and recorders." It is unnecessary therefore to compel defendants to render any "personal

services or acts involving skill, labor and judgment." If they be so advised, they may avoid personal services by contracting with one of the "first class machine shops" around Richmond or elsewhere to build the counters and recorders which defendants have contracted to deliver to the Commonwealth.

Accordingly, the trial court is directed to modify its decree of February 15, 1954 so as to require the defendants to prepare, build, construct and deliver or cause to be prepared, built, constructed and delivered to the Clerks of the Senate and House of Delegates, the property specified in that decree. As thus modified, the decree is affirmed and the case remanded for such proceedings as may be necessary to carry out the views herein expressed.

*Modified and affirmed.*