DELIA DAVID, COMPLAINANT, AND DIVISION ON CIVIL RIGHTS, DEPARTMENT OF LAW AND PUBLIC SAFETY, STATE OF NEW JERSEY, APPELLANT, v. VESTA COMPANY AND HENRY C. SENGER, JR., JOHN LOWE, JOSEPH T. PANUCCI, AND MRS. ALFRED DAGLE, RESPONDENTS.

VINCENT LLOYD HARRIS AND NIRZA HARRIS, INTERVENORS-APPELLANTS (BY LEAVE OF COURT), AND NEW JERSEY COMMITTEE AGAINST DISCRIMINATION IN HOUSING AND EIGHT OTHER INTERVENING ORGANIZATIONS, *AMICI CURIAE* (BY LEAVE OF COURT), v. COLONIAL HEIGHTS, INC., TOBIAS AGENCY, INC. AND RIVER HEIGHTS, INC., INTERVENORS-RESPONDENTS (BY LEAVE OF COURT).

NEW JERSEY HOME BUILDERS ASSOCIATION, *ET AL.*, PLAINTIFFS-APPELLANTS, v. DIVISION ON CIVIL RIGHTS IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 30, 1965—Decided June 28, 1965.

302

No. *A-109*

Mr. *Alan B. Handler,* First Assistant Attorney General, argued the cause for the appellant, Division on Civil Rights, Department of Law and Public Safety, State of New Jersey (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Howard H. Kestin,* Deputy Attorney General, of counsel and on the brief).

Mrs. *Ruth G. Blumrosen,* of the Michigan Bar, argued the cause for the New Jersey Committee Against Discrimination in Housing and eight other intervening organizations (*Mr. Morton Stavis* and *Mr. Herbert H. Tate,* attorneys; *Mrs. Ruth G. Blumrosen* on the brief).

Mr. *Warren E. Dunn* argued the cause for the intervenors-respondents, Colonial Heights, Inc. and Tobias Agency, Inc. (*Messrs. Dunn & Ambrose,* attorneys; *Mr. David M. Sweetwood* on the brief).

Mr. *Morris M. Schnitzer* argued the cause for the intervenor-respondent, River Heights, Inc. (*Messrs. Kasen, Schnitzer & Kasen,* attorneys; *Mr. Waldron Kraemer* on the brief).

No. *A-126*

Mr. *W. Louis Bossle* argued the cause for the plaintiffs-appellants, New Jersey Home Builders Association, *et al.*

Mr. *Alan B. Handler,* First Assistant Attorney General, argued the cause for the defendant-respondent, Division on Civil Rights in the Department of Law and Public Safety of the State of New Jersey (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Morton Anekstein* on the brief).

The opinion of the court was delivered by

PROCTOR, J. This opinion involves two separate appeals. Both concern the constitutionality of the housing accommodation sections of the New Jersey Law Against Discrimination (hereafter law), *N. J. S. A.* 18:25–1 *et seq.*

The first case had its inception in a complaint filed by Delia David, a Negro, in the Division on Civil Rights, alleging that respondents Vesta Company and its agents discriminated against her in the rental of an apartment in a privately financed apartment house owned and operated by the Vesta Company. After a hearing conducted by the Division on Civil Rights which resulted in a determination that an unlawful discrimination had occurred, an order was entered directing the respondents to cease and desist their discrimination. The respondents appealed to the Bergen County Court, Law Division. The county court dismissed the complaint, holding that *N. J. S. A.* 18:25–5(n) was an unconstitutional denial of equal protection because it created an impermissible classification between those types of privately financed housing subject to the law and those which are excluded. *David v. Vesta Co.*, 81 *N. J. Super.* 593 (*Cty. Ct.* 1963). On the appeal by David and the Division on Civil Rights, the Appellate Division permitted the intervention of Vincent L. Harris and Nirza Harris, Colonial Heights, Inc., Tobias Agency, Inc., and River Heights, Inc.

The Harrises, who are Negroes, had filed a complaint against Colonial Heights and its exclusive rental agent, Tobias Agency, in the Division on Civil Rights. The complaint alleged that Tobias Agency and Colonial Heights (which in September 1963 was the owner of a large tract of land upon which it was building a garden apartment complex of about 400 dwelling units) had discriminated against the Harrises in the rental of an apartment. The county court decision in *David v. Vesta Co.* preceded the scheduled hearing of this complaint and the Division on Civil Rights therefore consented to the intervention of Colonial Heights. River Heights owns a recently constructed garden apartment house

development and alleges that it has been charged with racial discrimination in the rental of an apartment. The court also permitted the New Jersey Committee Against Discrimination In Housing and eight other organizations to appear as *amici curiae*. While the appeal was pending in the Appellate Division, David and Vesta Company reached a settlement and are no longer parties. We certified the matter on our own motion before argument in the Appellate Division. Before us the Division on Civil Rights and the Committee Against Discrimination In Housing advocate the constitutionality of the law, while Colonial Heights, Tobias Agency, and River Heights challenge its constitutionality. The Harrises have joined in the briefs filed by the Division and by the Committee.

The plaintiffs in the second case, New Jersey Home Builders Association, New Jersey Association of Real Estate Boards, and Joseph V. Montoro, instituted a suit in the Superior Court, Chancery Division, under the Uniform Declaratory Judgment Act, *N. J. S.* 2A:16–50 *et seq.*, challenging the constitutionality of the law. The trial court found the statute to be constitutional for the reasons expressed in its opinion in *New Jersey Home Builders Ass'n v. Div. on Civil Rights*, 81 *N. J. Super.* 243 (*Ch. Div.* 1963).[1] Home Builders appealed, and we certified the matter on our own motion before argument in the Appellate Division.

The challengers of the law contend that certain sections deprive them of their constitutional rights to due process of law and to the equal protection of the laws. The pertinent sections are *N. J. S. A.* 18:25–4, which provides:

---

[1] The trial court held that New Jersey Home Builders Association and the New Jersey Association of Real Estate Boards did not have standing to challenge the statute but held that Montoro had standing. We need not in this case decide whether the associations had standing as their counsel also represents Montoro and has, in his brief and oral argument on the constitutional issues, treated his three clients as one. Therefore, the three parties will be jointly denominated as "Home Builders."

"All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry or age, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right."

And *N. J. S. A.* 18:25–5(n), which provides:

"The term 'real property' includes real estate, lands, tenements and hereditaments, corporeal and incorporeal, provided however that, except as to publicly assisted housing accommodations, the provisions of this act shall not apply (1) to the sale or rental of a dwelling, or of a portion hereof, containing accommodations for not more than 3 families, one of which is maintained by the owner at the time of sale or rental as the household of his family, or; (2) to the sale or rental of a dwelling, or a portion thereof, containing accommodations for not more than 2 families, except, however, such dwellings shall be included within the term 'real property' when they are part of a group of 10 or more dwelling houses constructed or to be constructed on land that is contiguous (exclusive of public streets) and are offered for sale or rental by a person who owns or has owned or otherwise controls or has controlled the sale or rental of such group of dwelling houses, or; (3) to the rental, by the owner or occupant of a one-family accommodation in which he or members of his family reside, of a room or rooms in such accommodation to another person or persons. Nothing herein contained shall.be construed to bar any religious or denominational institution or organization, or any organization, operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, in the sale, lease or rental of real property, from limiting admission to or giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained."

## I.

*DUE PROCESS.*

██ Colonial Heights, Tobias Agency, and Home Builders contend that the above sections deny them due process of law. They point out that *Article* I of the New Jersey *Constitution of* 1947 provides that among the natural and unalienable rights of all persons are those of acquiring, possessing and

protecting property, and that under the Fourteenth Amendment the States are precluded from depriving any person of property without due process of law. Under these constitutional principles, they urge that one person has as much of a right to dispose of his real property as does another person to acquire it. They contend that these countervailing constitutional rights are equal, and therefore the State has no power to disturb the balance by legislation. The fallacy of this argument is the invalid assumption that these private property rights exist in a vacuum and are absolute in nature. Private property rights are not absolute. They are always subject to the reasonable exercise of the police power. As was said by the United States Supreme Court in *Nebbia v. People of State of New York*, 291 *U. S.* 502, 523, 54 *S. Ct.* 505, 510, 78 *L. Ed.* 940, 948–949 (1934):

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

In the State's exercise of its police power it has placed myriad restrictions upon the property owner's right to use land as he chooses. For example, the law of nuisance, easements by necessity, the division of the benefits of water, sanitary regulations, building codes, zoning ordinances and statutes, and planning regulations, have all been recognized as legitimate restrictions on the use of private property. See Powell, "The Relationship Between Property Rights and Civil Rights," 15 *Hastings L. J.* 135, 140–149 (1963). More pertinent to the issue before us, the rule against perpetuities, the rule against certain restraints on the alienation of land, the rule prohibiting a testator from devising his property sub-

ject to a condition which violates the public welfare,[2] and rent ceiling laws are all examples of legitimate police power restrictions upon the right of a private property owner to dispose of his property as he chooses. *Ibid.* In short, the private property owner has the right to use and dispose of his property as he chooses *only* so long as his action is not contrary to the general welfare.

The New Jersey Constitution, *Article* I, *par.* 5, forbids the denial of any civil right by discrimination on the basis of religious principles, race, color, ancestry or national origin. The law now before us declares that it is an exercise of the police power in fulfillment of that constitutional guarantee of civil rights.[3] The law also sets forth that the Legislature finds and declares the discrimination proscribed therein to be a political, economic and social evil.[4] That finding undoubtedly comports with reality. The deleterious effect upon our society of discrimination against members of minorities has been so convincingly and abundantly demonstrated that it is now a matter of common knowledge.

The question remains whether regulation of the sale or rental of private housing is a valid means toward elimination of the evils of such discrimination. *Jones v. Haridor*

---

[2] See, *e.g., Girard Trust Co. v. Schmitz,* 129 *N. J. Eq.* 444 (*Ch.* 1941), where a devise of a property to several of the testator's brothers and sisters subject to the condition that they abstain from social intercourse with a brother and sister expressly disinherited by the will was held void as against public policy.

[3] *N. J. S. A.* 18:25–2 provides:

"The enactment hereof shall be deemed an exercise of the police power of the State for the protection of the public safety, health and morals and to promote the general welfare and in fulfillment of the provisions of the Constitution of this State guaranteeing civil rights."

[4] *N. J. S. A.* 18:25–3 provides:

"The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age or because of their liability for service in the Armed Forces of the United States, are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State."

*Realty Corp.,* 37 *N. J.* 384 (1962), settled the question of the legitimacy of prohibiting such discrimination in publicly assisted private housing. In so doing, Justice Francis, speaking for a unanimous court, rejected the property owner's due process argument, saying:

"Discrimination against Negroes in the sale and rental of housing accommodations results in inadequate housing for them and in segregation in housing. They are thus compelled in large numbers to live in circumscribed areas under substandard, unhealthy, unsanitary and crowded living conditions. These conditions in turn produce disease, increased mortality, unstable family life, moral laxity, crime, delinquency, risk of fire, loss of tax revenue and intergroup tensions. See *Levitt* [*Levitt & Sons, Inc. v. Division Against Discrimination in the State Dept. of Education*], *supra,* 31 *N. J.* [514], at *p.* 531; *Berman v. Parker,* 348 *U. S.* 26, 32, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954) ; 5 *N. Y. City Charter & Code* § W41-1.0; *Report, United States Commission on Civil Rights, Housing, supra,* 1–4; *Report, United States Commission on Civil Rights,* 1959, *p.* 534. Standards of sanitation have to be sacrificed because strict enforcement of building and health codes will simply make a great many people homeless. See 'State Action,' 14 *Stan. L. Rev.* 3, 47 (1961). All of these things imperil the tranquillity of a community. In addition, substandard and segregated housing seriously complicates the problem of public school integration. Manifestly, in their totality these conditions reveal an evil which it is within the competence of the lawmakers to correct." *Id.,* 37 *N. J.,* at *p.* 392

The Legislature in 1961 amended the Law to extend its coverage to include certain nonpublicly assisted private housing. *L.* 1961, *c.* 106, *p.* 683. This extension was not under review in *Jones, supra.* However, the language of the Court in that case is equally applicable to the extended coverage which is now under review. The extension of the statute is but another step toward the accomplishment of the legitimate legislative objective. The statute here is certainly as reasonable a regulation of private property toward the achievement of a highly desirable public goal as are planning and zoning laws. The latter have long been upheld when attacked as taking property without due process of law. *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926).

We conclude that the law, in forbidding discrimination because of race, creed, color, national origin or ancestry in the sale or rental of privately financed private housing of the types covered by the law, is a reasonable exercise of the police power, and is not a taking of property without due process of law.

## II.

*EQUAL PROTECTION.*

All the challengers of the sections of the law now before us contend that these sections by excluding certain types of private property from the reach of the statute create arbitrary classifications which deny them equal protection of the laws. *N. J. S. A.* 18:25–5(n) in defining "real property," and therefore delineating the scope of the statute, expressly excludes (1) the sale or rental of privately financed dwellings occupied by the owner and accommodating three or less families, (2) the sale or rental of privately financed dwellings containing accommodations for two or less families, except where such dwellings are part of a group of ten or more contiguous dwellings offered by one person, and (3) the rental of rooms in privately financed single family dwellings occupied by the lessor.

The challengers argue that there is no rational basis for the exclusion of the above dwellings while other private property is included, and that the statute has the effect of arbitrarily permitting some private property owners to discriminate while prohibiting others. They urge that if prevention of discrimination against minorities in housing is the legislative goal, discrimination in all types of housing should have been prohibited.

The rules for judicial review of a legislative classification which is challenged as a denial of equal protection are well settled. The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and there-

fore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal protection clause forbids only invidious discrimination. *Morey v. Doud*, 354 *U. S.* 457, 463–464, 77 *S. Ct.* 1344, 1 *L. Ed. 2d* 1485, 1490 (1957); *Williamson v. Lee Optical of Okla.*, 348 *U. S.* 483, 489, 75 *S. Ct.* 461, 99 *L. Ed.* 563, 573 (1955); *New Jersey Restaurant Ass'n v. Holderman*, 24 *N. J.* 295, 300–302 (1957).

More specifically, evils in the same field may be of different dimensions and proportions, and the reform may therefore take one step at a time, attacking the evil where it seems most acute to the legislative mind. See *Williamson, supra*. As Chief Justice Weintraub said in *Holderman, supra*, at *pp*. 300–301:

"Thus, it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. * * * The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of 'some substantial consideration of public policy or convenience or the service of the general welfare.' * * * Hence it may 'stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact.' "

Applying the above principles, we have concluded that the classification before us here has not been shown to be an invidious discrimination, such as would offend the constitutional guarantee of equal protection of the laws.

It would have been reasonable for the Legislature to find that the evil of discrimination against minority groups

in housing is most acutely felt by Negroes; and that the housing accommodations most urgently sought by them are those found in the larger multiple housing developments, both apartments and single family houses. It is common knowledge that the economic status of Negroes in New Jersey is considerably less than that of the white population. The Legislature, recognizing this fact, could have supposed that multiple housing developments are more likely to be within the Negroes' limited means. Furthermore, the Legislature could have found that by freeing the large multiple housing developments from discrimination, a desired pattern of interracial living will be more readily established in the whole community. See Note, "Racial Discrimination in Housing," 107 *U. Pa. L. Rev.* 515, 531 (1959). On the record before us, we cannot say that the Legislature has not properly proceeded one step at a time, attacking the evil where it is most acutely felt.

As was stated in *Holderman, supra,* another legitimate reason for classification is the consideration of "administrative convenience and expense." We can conceive that the Legislature could have properly contemplated that regulation of the exempted real property would involve relatively greater problems of enforcement, regulation and administration which would in turn entail disproportionate expense. For example, the property transactions within the scope of the law are transactions which are most likely to be motivated by exclusively economic considerations of the seller or lessor. On the other hand, the property transactions excluded from the scope of the law are likely to be motivated also by personal considerations other than profit-making. Consequently it might be more difficult to prove an act of unlawful discrimination in the property transactions excluded from the law than those included. This one problem, which we have pointed to as merely an example, can readily be conceived to have the potential of greatly increasing the difficulty and expense of enforcement, regulation and administration of the law.

 The challengers also contest the validity of excluding the accommodations specifically set forth in subsection (n), while including accommodations which are identical but for public assistance. The validity of the distinction between publicly and nonpublicly assisted housing was settled in *Levitt & Sons, Inc. v. Div. Against Discrimination, etc.,* 31 *N. J.* 514 (1960), and *Jones v. Haridor Realty Corp., supra.* We cannot perceive how the subsequent inclusion within the law of some types of nonpublicly financed housing in any way undermines the validity of that distinction.

 Colonial Heights and Tobias Agency further urge that the express exception in subsection (n) of the sale or rental of real property by religious institutions constitutes an unlawful classification. However, the statute does not exempt all sales or rentals of real property owned by a religious organization, but only those which are "calculated by such organization to promote the religious principles for which it is established or maintained." This limitation narrows the scope of the exception to transactions which are non-commercial in nature. The Legislature could have reasonably concluded that there was no appreciable demand by minority groups for housing accommodations in such dwellings. To paraphrase the statement made by the United States Supreme Court in *Williamson, supra,* 348 *U. S.,* at *p.* 489, 75 *S. Ct.,* at *p.* 465, 99 *L. Ed.,* at *p.* 573, for all this record shows, these transactions by religious organizations may not loom large in New Jersey. We conclude that the challengers have failed to sustain their burden of establishing an invidious classification on this ground.

In summary, we hold that the challengers have failed, on all the grounds which they have urged, to show that the law results in a denial of equal protection of the laws.

The New Jersey Committee Against Discrimination in Housing, *et al.,* has argued that discrimination in the sale or rental of all housing in New Jersey is prohibited by *Article* I,

*par.* 5 of the New Jersey Constitution.[5] As a corollary, they contend that this constitutional provision is self-implementing so that an aggrieved party can institute an action in the courts to enforce his constitutional right. So viewed, the law merely provides an administrative procedure to implement the constitutional guarantee as to certain types of housing, leaving unlawful discrimination in housing outside the scope of the law to be prevented by individual initiation of actions in the courts as contemplated by the constitutional provision. See Blumrosen, "Antidiscrimination Laws in Action in New Jersey: A Law-Sociology Study," 19 *Rutgers L. Rev.* 189, 275–282 (1965).

However, in view of our holding that the law does not deprive the challengers of due process of law or equal protection of the laws, we need not determine the validity of the Committee's contention. Assuming their position to be correct, it would be clear that the classification between properties subject to the law, and those expressly excluded from its coverage is constitutionally permissible. As Justice Frankfurter said in *Tigner v. State of Texas,* 310 *U. S.* 141, 149, 60 *S. Ct.* 879, 883, 84 *L. Ed.* 1124, 1129 (1940), "Differences that permit substantive differentiations also permit differentiations of remedy." Here, the Legislature could find that persons likely to buy or rent those dwellings outside the scope of the law are more capable by training and income to undertake individual court actions, while those persons likely to buy or rent dwellings covered by the law would need the aid of an administrative agency.

---

[5] *Article* I, *par.* 5 provides:

"No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin."

### III.

*INVOLUNTARY SERVITUDE.*

 The law provides that upon a finding of unlawful discrimination, the director may order the respondent "to cease and desist from such * * * unlawful discrimination and to take such affirmative action, including, but not limited to * * * extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act * * *." *N. J. S. A.* 18:25–17.

Home Builders asserts that a method of operation of the plaintiff Montoro, as well as other of its members, is to erect a few sample homes and then from these samples to enter into a contract with a prospective homeowner to sell him a lot and build him a house in the development like one of the sample homes, and to actually erect the house. It argues that to compel a developer to construct a dwelling for another is to force him to labor against his will, and that this amounts to involuntary servitude in violation of the Thirteenth Amendment of the Federal Constitution.[6]

Home Builders calls our attention to *Jones v. Haridor Realty Corp., supra,* and argues that implicit in this Court's holding there was our approval of an order that the respondent build the complainant a house in the development. In that case, the respondent, like Montoro here, constructed several model homes, and then from the model homes contracted to sell a building lot and erect a house in the development.

 The Thirteenth Amendment was adopted to abolish slavery and to abolish long term indenture of persons as an

---

[6] The Thirteenth Amendment provides:

"Section I. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section II. Congress shall have power to enforce this article by appropriate legislation."

evasion of prohibitions against slavery. "[T]he term 'involuntary servitude' was intended to cover those forms of compulsory labor akin to African slavery which, in practical operation, would tend to produce like undesirable results." *Butler v. Perry,* 240 *U. S.* 328, 332, 36 *S. Ct.* 258, 259, 60 *L. Ed.* 672, 674 (1916). Cited with approval in *Heart of Atlanta Motel, Inc. v. United States,* 379 *U. S.* 241, 85 *S. Ct.* 348, 13 *L. Ed.* 2d 258, 271 (1964).

The order implicitly approved by this Court in *Jones v. Haridor Realty Corp., supra,* directed the respondent 'to enter into a contract with Jones to sell him a house and building lot upon the terms available to all other purchasers." *Id.,* 37 *N. J.,* at *p.* 389. The order did not direct the individual respondents to personally perform any labor in the construction of the house. At most, the order obligated the respondents to see that the house was constructed. They were free to substitute the performance of another, whether he be a subordinate agent or an independent contractor. Such an order does not violate the Thirteenth Amendment. See *Marcus Brown Holding Co. v. Feldman,* 256 *U. S.* 170, 199, 41 *S. Ct.* 465, 65 *L. Ed.* 877, 889 (1921), and *Thompson v. Commonwealth,* 197 *Va.* 208, 89 *S. E.* 2d 64 (*Sup. Ct. App.* 1955). Moreover, such an order would not require a developer and builder to remain in business, but would merely impose a reasonable requirement upon him if he chose to do so. See *Barnes v. State ex rel. Pinkney,* 236 *Md.* 564, 204 *A.* 2d 787, 795 (*Ct. App.* 1964). *Cf. State v. Sprague,* 105 *N. H.* 355, 200 *A.* 2d 206 (*Sup. Ct.* 1964).

Surely the Thirteenth Amendment was not intended to prohibit orders such as the one contemplated here which is a far cry from the slavery and involuntary servitude the Thirteenth Amendment was intended to proscribe. See Ratner, "Involuntary Servitude or Inapposite Solicitude," 49 *Cornell L. Q.* 502 (1964); Scheiber, "The Thirteenth Amendment and Freedom of Choice in Personal Service Occupations: A Reappraisal," 49 *Cornell L. Q.* 508 (1964); Shapiro, "Involuntary Servitude; The Need for a More Flexible Approach,"

19 *Rutgers L. Rev.* 65 (1964); *cf.* Avins, "Freedom of Choice in Personal Service Occupations: Thirteenth Amendment Limitations an Antidiscrimination Legislation," 49 *Cornell L. Q.* 228 (1964).

## IV.

### *SEPARATION OF POWERS.*

 Colonial Heights and Tobias Agency contend that the law is unconstitutional because it vests judicial powers in the executive branch of the state government in violation of *Article* III of the New Jersey Constitution. *Article* III provides:

"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

The law provides that all persons shall have the opportunity to obtain employment, to obtain the accommodations of any place of public accommodation, public housing, and other housing (with the exceptions discussed earlier in this opinion) without discrimination because of race, creed, color, national origin, ancestry or age (*N. J. S. A.* 18:25–4). The Division on Civil Rights in the Department of Law and Public Safety is established by the law for the purpose of preventing and eliminating the discrimination proscribed by section 4 (*N. J. S. A.* 18:25–6). The Division consists of the Attorney General and a seven-member commission appointed by the Governor, with the advice and consent of the Senate. The law vests the Attorney General with broad supervisory powers and duties in the Division, including the duty to organize and administer the work of the Division (*N. J. S. A.* 18:25–8(b) and (c)); the power to appoint a Director of the Division, who shall act for the Attorney General in his place and with his powers subject to the approval of the commission and the Governor, and all other personnel ((d) and (e)); and the power to appoint, subject to the approval of the commission,

hearing examiners to conduct hearings and recommend findings of fact and conclusions of law (*N. J. S. A.* 18:25–8 (*l*)).

Any person claiming to be aggrieved by an unlawful discrimination proscribed by the law may file a complaint with the Attorney General. The Attorney General, the Commissioner of Labor and Industry, or the Commissioner of Education may in like manner file such a complaint (*N. J. S. A.* 18:25–13). The Attorney General thereupon causes an investigation to be made, and if probable cause exists, endeavors to eliminate the unlawful discrimination by a "conciliation conference" (*N. J. S. A.* 18:25–14). If the alleged discrimination cannot be eliminated, a hearing is held on proper notice to the respondent (*N. J. S. A.* 18:25–15). In connection with the hearing, the Attorney General may subpoena witnesses, compel their attendance, and take testimony under oath (*N. J. S. A.* 18:25–8(i)). The evidence tending to show an unlawful discrimination is presented by an attorney for the Division, and the respondent may submit evidence in rebuttal. The original complainant, in the discretion of the Director, may intervene (*N. J. S. A.* 18:25–16). The testimony taken at the hearing must be transcribed (*N. J. S. A.* 18:25–16).

*N. J. S. A.* 18:25–17 provides:

"If, upon all evidence at the hearing the director shall find that the respondent has engaged in any * * * unlawful discrimination as defined in this act, the director shall state his findings of fact and conclusions of law and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such * * * unlawful discrimination and to take such affirmative action, including, but not limited to * * * extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act, and including a requirement for report of the manner of compliance. If, upon all the evidence the director shall find that the respondent has not engaged in any such * * * unlawful discrimination, the director shall state his findings of fact and conclusions of law and shall issue and cause to be served on the complainant an order dismissing the said complaint as to such respondent."

The Director may enforce an order by a civil action (*N. J. S. A.* 18:25–19). But the law also provides that the willful violation of an order of the Director or the Attorney General shall be a misdemeanor (*N. J. S. A.* 18:25–26). Appeal to the Appellate Division of the Superior Court from a final order of the Director may be taken as an appeal from a State administrative agency (*N. J. S. A.* 18:25–21).

Colonial Heights and Tobias Agency argue that the aforementioned statutory provisions leave no doubt that a judicial tribunal, with jurisdiction over all persons owning real property, is constituted in the executive department of the state government, and that this is in violation of the separation of powers principle embodied in *Article* III of the State Constitution.

 The doctrine of separation of powers is a fundamental principle of American government, expressly provided for in the constitutions of many states, and implied in almost all the others and in the federal government from the creation of the three separate branches of government. See *Annot.* 69 *A. L. R.* 266 (1930); *Annot.* 89 *A. L. R.* 1113 (1934). But a strict interpretation of the principle, rigidly classifying all governmental action as legislative, executive, or

Not until the *Constitution of* 1844 was the doctrine of separation of powers explicitly incorporated in the Constitution. But even under that Constitution and the present Constitution, which was adopted in 1947, the judiciary continues to perform numerous nonjudicial functions (see the voluminous list compiled in Chief Justice Vanderbilt's opinion in *Massett Building Co. v. Bennett*, 4 *N. J.* 53, 59–61 (1950)). And nonjudicial bodies as, for example, the Division of Tax Appeals in the State Department of Taxation and Finance (see *N. J. S. A.* 54:2–35) and the Workmen's Compensation Division (*N. J. S. A.* 34:1A–1 *et. seq.*) continue to perform functions which are adjudicative in nature. Thus, there has long existed a considerable overlapping of the three governmental functions. It is therefore inconceivable that the drafters of our *Constitutions of* 1844 and 1947 intended an absolute prohibition of any exercise by the executive branch of the power of adjudication.

judicial was never intended by Montesquieu[7] (who is generally acknowledged to have first articulated the principle as a politicay theory), by the founding fathers of our federal system,[8] or by the drafters of our State Constitutions.[9]

Furthermore, such a rigid classification is neither possible nor practicable. "If the doctrine of the separation of powers were a doctrinaire concept to be made use of with pedantic rigor, the use of the modern administrative agency would have been an impossibility in our law." *Schwartz, The Supreme Court* 102 (1957). As was said by this Court in *Massett Building Co. v. Bennett,* 4 *N. J.* 53, 57 (1950):

> "[T]he doctrine of separation of powers is not peculiar to New Jersey; it exists in one form or another in almost every American constitution; and it has nowhere been construed as creating three mutually exclusive water-tight compartments. To do so would render government unworkable and the slave of a doctrine that has for its beneficial purpose the prevention of despotism that inevitably results from the concentration of all the powers of government in one person or in one organ of government."

 It is clear that the character of the act claimed to be an exercise of judicial or legislative power cannot be determined by the nature of the mental act performed in arriving at a decision. See generally, Brown, "Administrative Commissions and the Judicial Power," 19 *Minn. L. Rev.* 261, 267–268 (1935). Thus, within the bounds of their respective duties and powers, both the executive and the judicial branches must "adjudicate" and "legislate." As to adjudication by the executive branch, the language of Chief Justice Vanderbilt speaking for the court in *Mulhearn v. Federal Shipbuilding and Dry Dock Co.,* 2 *N. J.* 356, 364–365 (1949) is apropos.

---

[7] See *The Federalist No. 47 (Madison)*; see also *Vanderbilt, The Doctrine of the Separation of Powers and its Present-Day Significance* 45 (1953).

[8] See *The Federalist No. 47 (Madison).*

[9] The New Jersey *Constitution of 1776* commingled judicial, legislative and executive power. *The Federalist No. 47,* at *p.* 318 *(Modern Lib. ed.) (Madison).* See also *Pound, Organization of Courts* 65, 79, 96 (1940); and *Mulhearn v. Federal Shipbuilding and Dry Dock Co.,* 2 *N. J.* 356, 362–363 (1949).

There, in the course of discussing the adjudicatory functions of the Division of Workmen's Compensation of the Department of Labor and Industry, he said:

"The failure to comprehentd that administrative adjudication is not judicial springs from the erroneous notion that all adjudication is judicial. This is not so and never has been so. * * * Were the rule otherwise and were every executive, administrative, legislative, or municipal adjudication deemed judicial and the official or body making the adjudication regarded as a judge or a court, we should be driven to treat every public official in the State, from the Governor to the members of a local board of adjustment passing on a zoning question, or of a board of education trying a school teacher on charges, as a judge or a court—a conclusion so extravagant that its mere statement demonstrates its fallaciousness as well as its undesirability. Once the obvious right of the Governor and the Legislature, each to adjudicate within his or its own proper sphere, is recognized and it is conceded that the courts are not the exclusive instrumentalities for adjudication, the true nature of the administrative adjudications, commonly termed 'quasi-judicial,' becomes apparent. This term serves to characterize not the quality of the adjudication but its origin outside the judicial branch of the government."

As to legislative thinking by the judiciary, an article by Chief Justice Weintraub entitled "Judicial Legislation," 81 N. J. L. J. 545 (1958), is instructive:

"I would like to discuss with you a process opprobiously called 'judicial legislation.' I could use a more palatable term, but I prefer 'judicial legislation' because I believe it accurately describes an important phase of the process of decision by the state courts and because I believe there can be more profit in frank acknowledgment than in resort to some fictional veneer, such as 'judicial declaration of the law.'

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Granted, what I believe all will concede, that the law must remain current, must reflect changing mores and values, must be adequate to resolve new problems with minimum disappointment to fair-minded men, the question remains whether the task is properly the sole responsibility of the legislative branch of government. I say 'properly' of the legislative branch because I have no doubt the state judiciary labors in that vineyard and hence to me the question is whether there is a trespass.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

We may as well concede that the judiciary makes law and changes judge-made law and deny a trespass on the basis that the constitutional framers could not have intended what would otherwise be a sterile and futile system of law."

See also Breitel, "The Lawmakers," 65 *Colum. L. Rev.* 749 (1965).

Nor can the similarity of the mechanics of the administrative procedure to judicial procedure be determinative. Brown, *supra,* 19 *Minn. L. Rev.,* at *pp.* 268–270. The more formal, and therefore more court-like, the procedure used in arriving at an adjudicative decision, the less likely that a party will be deprived of property without due process of law. Furthermore, the requirements contained in the Law Against Discrimination that a hearing be conducted on proper notice, that testimony taken at the hearing be transcribed, and that the Director state his findings of fact and conclusions of law, all facilitate the right to judicial review of administrative action which *Article* III, § 5, *par.* 4 of the New Jersey Constitution guarantees. See *Ward v. Scott,* 11 *N. J.* 117, 126–127 (1953).

The doctrine of separation of powers must therefore be viewed not as an end in itself, but as a general principle intended to be applied so as to maintain the balance between the three branches of government, preserve their respective independence and integrity,[10] and prevent the concentration of *unchecked* power in the hands of any one branch. See *Massett Building Co. v. Bennett, supra;* see also 1 *Davis, Administrative Law* § 1.09, at *p.* 68 (1958) ; and Breitel, "The Lawmakers," *supra.*

The administrative adjudication authorized by the Law Against Discrimination does not undermine the independence, integrity or strength of the judicial branch. The law involves no administrative intrusion upon subject matter jurisdiction of the judicial branch over traditional causes of action at law or in equity. Unlike *State v. Osborn,* 32 *N. J.*

---

[10] "While no rule of thumb will cover all the cases, in general it may be said that no deviation from the constitutional provisions incorporating the doctrine of the separation of powers will be tolerated which impairs the essential integrity of one of the great branches of government." *Massett Building Co. v. Bennett, supra,* 4 *N. J.,* at *p.* 57.

117 (1960), the law does not result in an administrative determination of guilt or innocence in criminal cases, an adjudicatory power which has uniformly been held exercisable only by the judicial branch. See 1 *Davis, supra,* § 2.13, at *p.* 133 (1958). *Cf. Atkinson v. Parsekian,* 37 *N. J.* 143, 152 (1962).

The Legislature has found that the discrimination proscribed by the Law "threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N. J. S. A.* 18:25–3. Thus, prevention of unlawful discrimination vindicates not only the rights of individuals but also the vital interests of the State. In short, such discrimination is regarded as a public wrong and not merely the basis of a private grievance. This Court in *Jones, supra, Levitt, supra,* and in the present case has recognized the correctness of the legislative finding that discrimination is inimical to vital public interests. And where such public interests are at stake, the involvement of an administrative agency is appropriate. See *General Drivers & Helpers Union v. Wisconsin Emp. Rel. Bd.,* 21 *Wis. 2d* 242, 254, 124 *N. W. 2d* 123 (*Sup. Ct.* 1963); see also *In re Opinion of the Justices,* 87 *N. H.* 492, 179 *A.* 344, 357, 110 *A. L. R.* 819 (*Sup. Ct.* 1935); Note, "The Right To Equal Treatment: Administrative Enforcement Of Antidiscrimination Legislation," 74 *Harv. L. Rev.* 526 (1961).

Furthermore, the procedures established by the law are far more conducive to the fulfillment of the legislative goal than would be a conventional action in the courts. It is likely that members of minority groups who are most frequently subjected to unlawful discrimination will not be in a position, for financial, educational or social reasons, to initiate effectively and carry through a conventional legal action. To relegate such persons to the exclusive remedy of a conventional legal action would "keep the word of promise to our ears, and break it to our hope."

Last, but by no means least, the administrative determination is not self-enforceable. If the Division wants to enforce its orders, it must do so through the courts. See *N. J. S. A.*

18:25–19. Penal sanctions for willful violation of its orders can only be imposed by judicial process. See *N. J. S. A.* 18:25–26. Furthermore, the administrative determination may, under *Article* VI, § V, *par.* 4 of the State Constitution, be judicially reviewed, as of right, by appeal to the Appellate Division. This insures that an administrative determination can be subjected to judicial scrutiny and fulfills the purpose of the separation of powers doctrine by preventing the concentration of unchecked power in the executive department. See generally *Dickinson, Administrative Justice and The Supremacy of Law in the United States* (1959).

We hold that the Law Against Discrimination does not violate *Article* III of the New Jersey Constitution.

## V.

For the reasons stated above, the judgment of the Bergen County Court in *David v. Vesta Co., supra,* is reversed; the judgment of the Chancery Division in *New Jersey Home Builders Ass'n v. Div. on Civil Rights, supra,* is affirmed.

No. A-109:

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.

No. A-126:

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.