628 A.2d 288

TOWN OF SECAUCUS, PLAINTIFF–RESPONDENT, v. HUDSON COUNTY BOARD OF TAXATION AND CITY OF BAYONNE, DEFENDANTS–APPELLANTS, AND COUNTY OF HUDSON, BOROUGH OF EAST NEWARK, TOWN OF GUTTENBERG, TOWN OF HARRISON, CITY OF HOBOKEN, CITY OF JERSEY CITY, TOWN OF KEARNY, TOWNSHIP OF NORTH BERGEN, CITY OF UNION CITY, TOWNSHIP OF WEEHAWKEN AND TOWN OF WEST NEW YORK, DEFENDANTS.

Argued February 17, 1993—Decided August 4, 1993.

485

*Margaret A. Holland,* Deputy Attorney General, argued the cause for appellant Hudson County Board of Taxation (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, and *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Eric Martin Bernstein* argued the cause of appellant City of Bayonne (*Weiner & Lesniak,* attorneys; *Mr. Bernstein, Beth Jaffe,* and *Nicholas A. Panepinto,* of counsel).

*Frances C. Holland* argued the cause for respondent (*Holland & Holland,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case asks the Court to resolve the question whether a statute enacted under the education laws that exempts the City of Bayonne from paying its share of taxes committed to the operation of the Hudson County Vocational School violates the State Constitution. In implementing the tax exemption, Hudson County established a two-tier tax system under which Bayonne paid a county tax rate lower than that of all other municipalities in Hudson County. The Town of Secaucus challenged that two-tier system as violating both the prohibition on special legislation, article IV, section 7, paragraph 9(6), and the uniformity clause, article VIII, section 1, paragraph 1, of the New Jersey Constitution. The trial court found for Secaucus on both those grounds. The Appellate Division affirmed that decision on uniformity clause grounds, but failed to reach the question of whether *N.J.S.A.* 18A:54–37 constituted special legislation. *Secaucus v. Hudson County,* 255 *N.J.Super.* 665, 605 *A.*2d 1151 (1992).

The Hudson County Board of Taxation petitioned this Court from that decision and we granted certification, 130 N.J. 396, 614 *A.*2d 618 (1993), to decide whether the exemption statute is constitutionally invalid.

I

The City of Bayonne, located in Hudson County, has operated a vocational-educational program since 1931. Originally, Bayonne implemented that program through a separate vocational high school. In the 1960s, however, Bayonne created a comprehensive high school that fully integrated the vocational program into its general high school curriculum. Bayonne's vocational-education program, which has been widely praised, allows vocational stu-

dents to participate fully in school activities and attend many classes with general education high school students.

In 1972, the Board of Education of the Hudson County Vocational School (hereafter "HCVS" or "county vocational school") passed a resolution authorizing the acquisition of a building for a new county vocational school. The following year, a $2 million budget was proposed for the operation of HCVS, and in 1974 HCVS began operating from its own facility. Realizing that the Bayonne vocational program, by that time in existence more than forty years, would not be discontinued, and wanting to spare Bayonne the double expense of supporting its own and the county's vocational programs, State legislators from Hudson County proposed legislation exempting Bayonne from contributing to the maintenance of the county vocational school.

The terms of the original legislation, proposed as *Senate Bill* 74 in the 1972 Legislative Session, were quite broad. Those terms provided that

each municipality included within a school district maintaining a system of vocational education approved for the purposes of Federal or State Allotment of vocational funds by the Commissioner of Education under the regulations of the State Board of Education shall be exempt from assessment, levy or collection of taxes based on any apportionment of amounts appropriated for the use of a county vocational school district.

The effect of the original legislation would have exempted virtually every municipality with a vocational-education program from contributing to the support of its county's vocational school. Recognizing that, Senate Education Committee amendments to *Senate Bill 74* significantly narrowed the scope of the exemption in order to exempt only Bayonne from the general obligation to support county vocational-educational programs. That narrowing was achieved by limiting the effect of the legislation in two ways. First, the amendments restricted the municipalities affected only to those in a "county of the first class having a population of not more than 700,000 according to the 1970 Federal Census." *L.*1973, *c.* 305, § 1. In 1973, *N.J.S.A.* 40A:6-1 defined a first class county as "a county having a population of more than 600,000." By that criterion, Bergen County (1970 population 897,148), Essex

County (1970 population 932,526), and Hudson County (1970 population 607,839) qualified as first class counties. Only Hudson, however, met the amended statute's population requirement for the tax exemption.

Second, the amendments required that in order for a municipality to qualify for the exemption, its vocational program would have to have been in existence, as a program approved by the State Board of Education for state or federal funding, for at least twenty years. Because, among the Hudson County municipalities, only Bayonne had a vocational education program in existence and approved by the State for at least twenty years, the amended statute applied only to Bayonne. The statement to the bill, from the Senate Education Committee, left no doubt about the intent of the legislation: "This bill, as amended, would exempt the City of Bayonne from any assessment of taxes due to the cost of supporting the county vocational school in Hudson County."

When the 1980 census revealed a reduction in Hudson County's population to 556,972, thereby jeopardizing its first-class status, the Legislature, by L.1981 c. 462, § 44, established population density as a new criterion and amended N.J.S.A. 40A:6-1 to redefine counties of the first class as "counties having a population of more than 550,000 and a population density of more than 3,000 persons per square mile." Under that reclassification, Hudson County, with a density of 12,801.1 residents per square mile, retained its status as a county of the first class. At the same time, the Legislature, by L.1981, c. 462, § 20, amended N.J.S.A. 18A:54-37 to substitute "latest federal decennial census" for "1970 federal census." Consequently, Bayonne remained the sole New Jersey municipality exempt from county-vocational-school tax payments.

The exemption statute, N.J.S.A. 18A:54-37, now reads:

Notwithstanding any of the provisions of chapter 54 of Title 18A of the New Jersey Statutes, in any county of the first class having a population of not more than 700,000 according to the latest decennial census, each municipality included within a school district which has maintained for a minimum of 20 years a vocational educational program approved for the purposes of federal or State allotment of vocational funds by the Commissioner under the regulation of the State Board of Education shall be exempt from assessment, levy or collection of taxes based on

any apportionment of amounts appropriated for the use of a county vocational school district.

To implement the mandate of *N.J.S.A.* 18A:54–37, Hudson County devised a two-tier tax system for assessing the county tax burden on its municipalities. The system, administered by defendant Hudson County Board of Taxation (HCBT), provided a higher rate (which included the costs of operating the county vocational school) for eleven of Hudson County's twelve municipalities, including plaintiff, Secaucus, and a lower rate (which excluded the costs of operating the county vocational school) for Bayonne. The dual rate was necessary because appropriations for county vocational education must be assessed, levied, and collected in the same manner as general county appropriations pursuant to *N.J.S.A.* 18A:54–29.2. Lacking any statutory authorization, HCBT could not separate the county vocational-school component from the common purpose budgetary requirements of the county. Under the two-tier system, the other eleven Hudson County municipalities, by paying proportionally more tax than Bayonne, compensated for the revenue lost through Bayonne's exemption from the cost of maintaining HCVS. As the Appellate Division noted: "Put more bluntly, and more precisely, Hudson County struck two county tax rates for its municipalities, the lower one solely for Bayonne." 255 *N.J.Super.* at 668, 605 *A.*2d 1151.

The two-tier system of taxation, however, operated not only in the assessment of regular county taxes but also in the determination of what each Hudson County municipality had to pay in added and omitted assessments. As the trial court in the litigation below explained:

On February 15, each year, municipalities must also pay to the county a share of the revenues derived pursuant to *N.J.S.A.* 54:4–63.1, *et seq.*, (added assessments of real estate), *N.J.S.A.* 54:4–63.12, *et seq.*, and *N.J.S.A.* 54:4–63.31, *et seq.*, (omitted assessments of real estate). These provisions prevent new properties constructed after the October 1 assessment date, or properties which were not included in the regular assessment list of October 1 for the tax year, from escaping taxation until the following year. Under *N.J.S.A.* 54:4–63.19, –63.38, the added or omitted property assessment list is multiplied by the county rate to calculate the sums due to the county for added and omitted taxes.

[*Secaucus v. Hudson County Bd. of Taxation,* No. 094204–86W (Law Div. June 29, 1990).]

By applying its two-tier system of taxation to the added-and-omitted assessments list, HCBT afforded Bayonne the benefit of a lower rate, while imposing on the other Hudson County municipalities a higher rate. Exacerbating the perception of unfairness in the two-tier tax system was the fact that the revenues generated by the added and omitted assessments were applied only to general county operating expenses and were not separately allocated to HCVS.

Accordingly, on October 17, 1986, Secaucus, as one of the eleven Hudson County municipalities subjected to the higher tax rate, brought a complaint in lieu of prerogative writs against Hudson County and HCBT. Secaucus initially challenged only the methodology by which HCBT calculated the two rates. Secaucus sought to have the county vocational school component excluded from the added and omitted assessments. By leave of the Appellate Division, Secaucus subsequently amended its complaint to include the claim that *N.J.S.A.* 18A:54–37 was unconstitutional as violating the special-legislation and uniformity provisions of the State Constitution. Bayonne was included as a necessary party.

Finding the effect of *N.J.S.A.* 18A:54–37 to be clearly discriminatory, the trial court ordered HCBT to adopt a single county tax rate, to debit Bayonne for its underpayment of county taxes, and to credit the eleven other municipalities for excess payments. On the constitutional claims, the trial court determined that *N.J.S.A.* 18A:54–37 violated both the uniformity clause of the New Jersey Constitution, article VIII, section 1, paragraph 1, and the special-legislation prohibition of article IV, paragraph 9, section 6. The trial court found a violation of the uniformity clause because *N.J.S.A.* 18A:54–37 granted a tax exemption to Bayonne based on the mere incidence of location, rather than on the use of its property. Applying the three-step special-legislation analysis of *Vreeland v. Byrne,* 72 *N.J.* 292, 300–01, 370 *A.*2d 825 (1977), the trial court also found the statute to be special legislation.

On August 31, 1990, this Court Ordered HCBT to comply with the trial court judgment requiring a single 1990 tax rate among all Hudson County municipalities, but stayed that part of the judgment requiring HCBT to credit and debit the Hudson County municipalities for prior years' payments under the two-tier tax system. The single Hudson County tax rate now in effect was computed for the 1990 tax year, pursuant to the Court's order.

The Appellate Division agreed with the trial court that *N.J.S.A.* 18A:54–37 violated the uniformity clause. The Appellate Division, however, applied an entirely different rationale. In its view, the lack of uniformity was caused "by excusing a taxpayer (Bayonne) from having to pay its proportionate share of the cost of an item in the budget of the taxing district (Hudson County)." 255 *N.J.Super.* at 669, 605 *A.*2d 1151. Because the uniformity clause requires that all real property "be taxed at the general rate of the taxing district in which the property is situated, for the use of such taxing district," the Appellate Division found that a uniform county tax rate as among the municipalities of a county is mandated by article VIII, section 1, paragraph 1. *Id.* at 668–69, 605 *A.*2d 1151. Having found *N.J.S.A.* 18A:54–37 unconstitutional under the uniformity clause, the Appellate Division did not reach the special legislation question.

## II

### A.

We now consider whether *N.J.S.A.* 18A:54–37 is unconstitutional because it is special legislation or because it violates the uniformity clause under the New Jersey Constitution. In answering the constitutional question, we consider as a preliminary matter two issues: the standing of HCBT to address the constitutionality of the exemption statute and the standard for reviewing claims challenging the constitutionality of legislation.

■ Secaucus claims that HCBT lacks standing to urge the constitutionality of *N.J.S.A.* 18A:54–37. That to have standing a

party must have "a sufficient stake and real adverseness with respect to the subject matter of the litigation" is well settled. *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Commission*, 82 *N.J.* 57, 67, 411 *A.*2d 168 (1980). Additionally, "[a] substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for the purposes of standing." *Ibid.* By those criteria, HCBT clearly has standing. Indeed, HCBT's present position is not unlike that of the Bergen County Board of Taxation in *Township of Mahwah v. Bergen County Bd. of Taxation*, 98 *N.J.* 268, 486 *A.*2d 818, *cert. denied sub nom. Borough of Demarest v. Township of Mahwah*, 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985). In that case, the Court heard the Bergen County Board of Taxation's cross-appeal on the constitutionality of county tax rebate statutes. Like the situation in *Mahwah*, the decision here will affect how the county tax board calculates the municipalities' apportioned share of county taxes. County boards of taxation are regarded as state agencies with the jurisdiction, authority, and responsibility over county taxes. *N.J.S.A.* 54:3–11; *see DeFeo v. Smith*, 17 *N.J.* 183, 188, 110 *A.*2d 553 (1955). As a state agency, HCBT will be affected by the determination of the constitutionality of the statute it is charged with enforcing. Significantly, HCBT has been involved in every step of this litigation, having been named by Secaucus as a defendant in both the original and amended complaints. Accordingly, we hold that HCBT has standing to be heard.

■ With respect to the standard for reviewing the constitutionality of State statutes, the Court will afford every possible presumption in favor of an act of the Legislature. *Holster v. Board of Trustees of Passaic County College*, 59 *N.J.* 60, 66, 279 *A.*2d 798 (1971). Where alternative interpretations of a statute are equally plausible, the view sustaining the statute's constitutionality is favored. *David v. Vesta Co.*, 45 *N.J.* 301, 212 *A.*2d 345 (1965); *In re Loch Arbor*, 25 *N.J.* 258, 135 *A.*2d 663 (1957); *see Edgewater Inv. Assocs. v. Borough of Edgewater*, 103 *N.J.* 227, 510 *A.*2d 1178 (1986). Only a statute "clearly repugnant to the constitution" will

be declared void. *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222–23, 486 *A.*2d 305 (1985).

Further, in the field of taxation, the Court has accorded great deference to legislative judgments. *McKenny v. Byrne,* 82 *N.J.* 304, 314, 412 *A.*2d 1041 (1980). The Court has recognized that absolute equality in taxation is a practical impossibility, *Borough of Totowa v. Passaic County Board of Taxation,* 5 *N.J.* 454, 464, 75 *A.*2d 874 (1950), and that absolute mathematical precision is not required. *Murnick v. Asbury Park,* 95 *N.J.* 452, 471 *A.*2d 1196 (1984). Additionally, in constitutional challenges based on the special-legislation prohibition of article IV, "the burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision." *Mahwah, supra,* 98 *N.J.* at 283, 486 *A.*2d 818.

No statute, however, can authorize an unconstitutional practice. *Township of West Milford v. Van Decker,* 120 *N.J.* 354, 357, 576 *A.*2d 881 (1990). Wherever a statute and the constitution come into conflict, the statute must give way. *Id.* at 364, 576 *A.*2d 881.

Accordingly, we must examine *N.J.S.A.* 18A:54–37 to see if it clearly and irremediably violates the constitutional provisions prohibiting special legislation, art. IV, § 7, ¶ 9, and mandating uniformity of taxation of real property within a taxing district, art. VIII, § 1, ¶ 1.

## B.

The *New Jersey Constitution* provides that:

9. The Legislature shall not pass any private, special or local laws:

\*      \*      \*      \*      \*      \*      \*      \*

(6) Relating to taxation or exemption therefrom. [*N.J. Const.* art. IV, § 7, ¶ 9(6).]

As Justice Garibaldi observed in *Town of Morristown v. Woman's Club,* "the guiding principles of taxation as embodied in the constitution, requir[e] that taxation of all real property be imposed only by uniform rules and exemption be accomplished only by

general laws." 124 *N.J.* 605, 612, 592 *A.*2d 216 (1991). *Town of Morristown* involved only a challenge under the uniformity provision of article VIII. We need not resolve whether the "general law" requirement of article VIII and the prohibition on special legislation of article IV are functionally identical for the purposes of tax laws challenged as special legislation. Whatever the case, the second principle that Justice Garibaldi enunciated is relevant to an article IV special-legislation analysis, *i.e.,* exemptions to taxation shall be accomplished only by *general* laws.

The concept of special legislation "has been well established in this state for almost a century." *Town of Morristown, supra,* 124 *N.J.* at 622, 592 *A.*2d 216 (Clifford, J., dissenting). From a constitutional standpoint, a law is regarded as special legislation " 'when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. The test of a special law is the appropriateness of its provisions to the objects that it excludes.' " *Ibid.* (quoting *Budd v. Hancock,* 66 *N.J.L.* 133, 135, 48 *A.* 1023 (Sup.Ct.1901)); *see Kimball Hosp. v. Brick Township Hosp.,* 86 *N.J.* 429, 446, 432 *A.*2d 36 (1981).

■ In *Vreeland v. Byrne,* the Court established a three-part test to determine whether a statute constituted special legislation. As Justice Mountain described it:

[T]he method of analysis is this: we first discern the purpose and object of the enactment. We then undertake to apply it to the factual situation presented. Finally we decide whether, *as so applied,* the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.

[72 *N.J.* at 300–01, 370 *A.*2d 825 (emphasis added).]

Accordingly, we must first discern the purpose of *N.J.S.A.* 18A:54–37; then apply that purpose to the specific facts of the case before us—the support of municipal and county vocational schools; and finally, decide whether *N.J.S.A.* 18A:54–37, as it actually operates, represents a reasonable legislative classification.

■ In seeking a rational purpose for a statute under constitutional challenge, "the court is not limited to the stated purpose of

the legislation, but should seek *any* conceivable rationale basis." *Mahwah, supra*, 98 *N.J.* at 286, 486 *A.*2d 818. Taken in a light most favorable to the constitutionality of the statute, two possible interpretations of *N.J.S.A.* 18A:54–37 on their face reveal a legitimate legislative purpose. First, *N.J.S.A.* 18A:54–37 may be conceived most generally as a tax relief statute designed to lessen the burden on those municipalities that maintain their own vocational education programs. On that view, the object of *N.J.S.A.* 18A:54–37 is to address the problem of double contribution by municipalities that have their own vocational programs to both a local vocational program and a county vocational program. Under that interpretation, *N.J.S.A.* 18A:54–37 could be analogized to programs like county health services, *N.J.S.A.* 18A:54–11, or county library services, *N.J.S.A.* 40:33–9, that address the problem of dual contributions by providing optional funding systems.

A second purpose of *N.J.S.A.* 18A:54–37 may be to promote the development of local, high-quality vocational educational programs within densely-populated communities. In achieving that objective, the statute would have the added benefit of reducing the strain on county vocational schools.

After careful scrutiny of the specific facts of this case and the statute under challenge, how *N.J.S.A.* 18A:54–37 realizes either of those purposes is difficult to see.

In the first case, if alleviating the problem of double contribution for municipalities that maintain their own vocational programs is the real purpose of *N.J.S.A.* 18A:54–37, the population-density and longevity requirements of the statute make little sense. At least twenty municipalities within the state, and at least one other municipality within Hudson County (Kearny), maintain their own vocational-education programs. As Secaucus noted, to the extent that the burden from double contribution is not any less for municipalities that have maintained local vocational programs for *fewer* than twenty years, the longevity requirement of *N.J.S.A.* 18A:54–37 seems particularly ill-suited to the goal of tax relief.

In the second case, if the goal of *N.J.S.A.* 18A:54–37 is to encourage the development of high-quality vocational-education programs within densely-populated municipalities, thereby reducing the strain on county vocational schools, to exclude municipalities either in the most-populous counties, *i.e.* Essex and Bergen, or in less but densely-populated counties like Union and Middlesex, does not seem reasonable. Nonetheless, the statute excludes Essex and Bergen on the basis of their excessive populations (over 700,000), and excludes densely-populated Union and Middlesex counties because they are not designated first-class counties.

That "[a] classification based on population does not automatically render a law unconstitutional special legislation" is well settled. *Newark Superior Officers Ass'n, supra,* 98 *N.J.* at 225, 486 *A.*2d 305. This Court has recognized the rational "nexus between accountability and population." *Id.* at 225–26, 486 *A.*2d 305 (citing and explaining cases in which the Court has upheld population classifications as rationally related to a legitimate legislative purpose); *see also Mahwah, supra,* 98 *N.J.* at 288–90, 486 *A.*2d 818 (citing and explaining cases in which Court has upheld population requirement against special-legislation challenges).

In *Mahwah, supra,* the Court considered a special legislation challenge to *N.J.S.A.* 54:4–5 (hereafter "the rebate statute") and what was then *N.J.S.A.* 54-4-5.2 (hereafter "the supplemental statute"). 98 *N.J.* at 271, 486 *A.*2d 818. The rebate statute, originally enacted in 1922,

> provided a rebate of a portion of a municipality's share of county taxes if the municipality were located in a first-class county with a population in excess of 800,000 and had within its borders 200 acres or more of land used and occupied by a state or county institution.

> [*Ibid.*]

The purpose and effect of the rebate statute was to reduce the burden imposed upon Cedar Grove, which acted as host municipality to the Essex county psychiatric hospital "without receiving any corresponding tax benefit." *Id.* at 275, 486 *A.*2d 818. In 1980, the Legislature had passed a supplemental statute that imposed a

"grandfather clause" on the rebate statute's benefits. By the terms of the supplemental statute, only those municipalities that had qualified for the rebate statute prior to September 1980 could come within the scope of the rebate statute. *Id.* at 293, 486 *A.*2d 818. The effect of the supplemental statute was to guarantee that Cedar Grove would remain "the only municipality to ever qualify for the rebate." *Ibid.*

The Court declined to find that the rebate statute was unconstitutional special legislation based merely on the rebate statute's population requirements. *Id.* at 290, 486 *A.*2d 818. Observing that common sense dictated that "an institution (like a county psychiatric hospital) in a county with a larger population will likely be utilized by more people than a similar institution in a smaller county," *ibid.*, the Court concluded that the costs to the host municipality of such an institution would be greater in a larger than in a smaller county. Accordingly, the Court found the population classification to have a reasonable basis.

In this case, we are cognizant of the fact that Hudson County is unique in terms of the density and urbanization of its population, having almost twice as many residents per square mile (12,108.1) as the next most densely-populated county, Essex County (6,701.-7). From that fact, it is possible to conjecture that the Legislature had a special interest in encouraging the development of local vocational education programs in the State's most densely populated areas. Nevertheless, that possibility seems remote, if not illusory. That concern has never been advanced as a possible legislative purpose or concern. Further, from the perspective of making educational services available to as many students as feasible, the encouragement of excellent vocational schools by individual school districts would make as much sense for less densely-populated areas as those more densely-populated. However, as already noted, the particular limitations embodied in *N.J.S.A.* 18A:54–37 go well beyond population size and density.

The requirement that the local vocational program be in operation for at least twenty years—the so-called "longevity" require-

ment—works to exclude other municipalities, in areas just as densely populated as Bayonne, from the benefit of the statute. To accept the classifications contained in *N.J.S.A.* 18A:54–37 as having a rational basis, one must imagine that the Legislature had some reasonable ground for encouraging the development of local vocational programs only in the most-densely-populated county in the state with a total population below 700,000, *and* that the Legislature had reasonable grounds for concluding that only those programs in existence for at least twenty years were of sufficient quality to be worthy of financial encouragement through tax relief. Those conclusions seem to us to stretch credulity beyond reasonable limits.

The dissent finds the statute rational because it pursues a very different mode of analysis of the classifications embodied in the statute. First, the dissent disaggregates the population and longevity requirements. With respect to the twenty-year approval requirement, the dissent simply refuses to "second-guess" the legislature and finds the longevity requirement rational. *Post* at 513, 628 *A.*2d at 304. The dissent then finds the population requirements, if not rational, at least harmless because "[t]he list of approved vocational programs reveals that no municipality either in Bergen or Essex Counties maintains such a program." *Post* at 514, 628 *A.*2d at 304.

It is important to keep in mind, however, that when the dissent refers to "such" programs, it means approved vocational-education programs *in existence for at least twenty years.* Under the longevity term of the statute, a school district is required to have "maintained for a minimum of 20 years a vocational educational program approved for the purposes of *federal or* State allotment of vocational funds by the Commissioner of Education." *N.J.S.A.* 18A54–37 (emphasis added). As recognized by the Appellate Division, "almost every local school district has an approved education program." 255 *N.J.Super.* at 667, 605 *A.*2d 1151. In turn, almost every municipality in the state maintains a vocational-education program approved for the purposes of federal aid under *N.J.A.C.* 6:43–2. Were the population ceiling (700,000) to be excised from the statute, those municipalities in Bergen and Essex

counties would still not qualify under the statute's classifications because their vocational-education programs have been in existence for less than twenty years.

When the dissent thus says that no municipalities in Bergen or Essex counties maintain "such" approved programs, what it means is that all approved vocational-education programs within those counties are excluded by the statute's longevity requirement. That is precisely the point. The interaction of the longevity and population requirements irrationally restricts the statute's classifications to exclude municipalities that, on any reasonable analysis, ought to come within the statute's purview.

■ An analysis of the history of *N.J.S.A.* 18A:54–37 further undermines the plausibility of interpreting the statute as a legitimate attempt to encourage local vocational programs in densely-populated areas.

Ordinarily, the fact that *N.J.S.A.* 18A:54–37 was enacted more than twenty years ago and amended by the Legislature in 1981 would create a strong presumption in favor of its constitutionality. *Mahwah, supra*, 98 *N.J.* at 291, 486 *A.*2d 818. In the instant case, however, a careful examination of the legislative history of *N.J.S.A.* 18A:54–37 and the circumstances of its amendment in 1981, only reinforce the perception that the statute constitutes special legislation.

As noted earlier, *supra* at 487, 628 *A.*2d at 290, the original terms of what became *N.J.S.A.* 18A:54–37 would have achieved the broad and entirely rational purpose of tax relief for all those municipalities that operated their own vocational-education programs. The bill was amended, however, to be directed toward a class of one: Bayonne. The special nature of the legislation was recognized by the Senate Education Committee itself, which described the legislation as a bill to "exempt the *City of Bayonne* from any assessment of taxes due to the cost of supporting the county vocational school in Hudson County." *supra* at 488, 628 *A.*2d at 291 (emphasis added).

When, in 1981, the population of Hudson County fell below 600,000, thus jeopardizing its status as a county of the first class,

the Legislature responded by redefining county of the first class with new total population and population-density requirements. The population-density requirement had the effect of keeping Middlesex County, which by 1980 had a population larger than that of Hudson County, from becoming a county of the first class. At the same time it redefined a first-class county, the Legislature amended *N.J.S.A.* 18A:54–37 so that its population ceiling of 700,000 would track the most recent decennial census. The effect of those amendments was to continue to guarantee that only Bayonne would derive the benefit of the statute's exemption.

True, a statute is not unconstitutional as special legislation merely because its effect is limited to a particular municipality. *Mahwah, supra*, 98 *N.J.* at 285, 486 *A.*2d 818. Nevertheless, the classification by which a statute limits its effects must be grounded in a rational basis. *Ibid.* When a statute has the effect of addressing the needs of a particular community or serving a particular legislative purpose, the Court looks to, *inter alia*, whether "other municipalities could, and from time to time have, come within its scope." *Ibid.*

In that regard, we draw a comparison to *Mahwah.* Unlike that case, the Court is not now presented with reasonable population requirements that invite the Court to "quibble by making comparisons to subjects slightly above or below the dividing line chosen by the Legislature." *Id.* at 291–92, 486 *A.*2d 818. Moreover, we note that in *Mahwah,* although the Court declined to invalidate the rebate statute based purely on the population classifications the statute imposed, the Court did strike down the supplemental statute that imposed a "grandfather clause" on those municipalities that could fall within the rebate statute's purview. *Id.* 293–94, 486 *A.*2d 818. We believe a strong analogy can be drawn between the grandfather clause in the supplemental statute invalidated in *Mahwah,* and the longevity requirement embodied in *N.J.S.A.* 18A:54–37. In this case, even if one could justify rationally the total population and population-density requirements of *N.J.S.A.* 18A:54–37, we cannot conceive of a rational basis for excluding

other municipalities that may satisfy the population requirements of *N.J.S.A.* 18A:54–37 on the basis of the fact that their vocational programs have not been approved by the State for at least twenty years.

The history of *N.J.S.A.* 18A:54–37 makes clear not only that the classifications embodied within it lacked a reasonable basis, but that no other municipality—partly due to the statute's subsequent amendment—has come within its scope or derived its benefit. Kearny, which implemented its vocational-education program in 1980, would come with the statute's scope in the year 2000. Were that to occur the statute would have been in operation almost three decades before a municipality other than Bayonne came within its scope.

Based on the foregoing analysis, we conclude that *N.J.S.A.* 18A:54–37, as it actually operates, does not represent a reasonable legislative classification. Accordingly, we find that *N.J.S.A.* 18A:54–37 violates the prohibition on special legislation of article IV, section 7, paragraph 9 of the New Jersey Constitution.

■ The dissent suggests that the Court sever the population ceiling from the statute, thus saving its constitutionality. *Post* at 514, 628 *A.*2d at 304. That sort of "judicial surgery" is warranted "if only a few of [an] Act's provisions may be severed without altering the Legislature's intended purpose." *Robinson v. Cahill,* 69 *N.J.* 449, 559, n. 20, 355 *A.*2d 129 (Pashman, J. dissenting). Accordingly, severance of the population requirement of *N.J.S.A.* 18A:54–37 would be justified only if "the legislative intent [of the statute] will be more nearly realized by exscinding this provision than by declaring the entire statute unconstitutional." *Vreeland, supra,* 72 *N.J.* at 301, 370 *A.*2d 825.

It is clear, however, that no such warrant exists in this case. At least twice in the statute's history, the Legislature was confronted with the opportunity of altering the scope of the statute's classifications so as to broaden its application. The first opportunity came at the time of the statute's original proposal. The second opportunity came with the publication of the 1980 federal census.

Each time the Legislature expressly declined those opportunities, acting affirmatively to keep the scope of the statute narrowed to a class of one—Bayonne.

In finding that the statute is unconstitutional as special legislation, we note, however, that *N.J.S.A.* 18A:54–37 is readily distinguished from statutes that allow municipalities to opt out of county services for which the municipality chooses to maintain a local program. Unlike those kinds of optional programs, such as county health or library services, *N.J.S.A.* 18A:54–37 does not afford tax relief to municipalities that operate local programs that are duplicated by county-wide programs. Rather, as we have detailed above, *N.J.S.A.* 18A:54–37 unreasonably limits its scope with both total population, population-density, and longevity requirements. Accordingly, finding *N.J.S.A.* 18A:54–37 to be in violation of the article IV prohibition on special legislation does not at all impugn the constitutional validity of other statutes that provide exemptions from contributions to county expenditures for services already provided by municipal governments. The test, in every case, is whether the classifications embodied in a particular statute "rest upon a reasonable or rational basis relevant to the purpose and object" of the statute. *Vreeland, supra*, 72 *N.J.* at 301, 370 *A.2d* 825.

## C.

Having found *N.J.S.A.* 18A:54–37 to be unconstitutional as special legislation, we need not reach the issue of whether the statute also violates the uniformity clause of article VIII. Nevertheless, because the Appellate Division decision raises important questions on the interpretation of the uniformity clause, we believe the following comments are in order.

Article VIII, the taxation article, of the New Jersey Constitution reads in relevant part:

§ 1(1)(a). Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such property shall be

taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

2. Exemption from taxation may be granted only by general laws. Until otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued. Exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.

The first paragraph quoted above, article VIII, section 1, paragraph 1(a), is most commonly called the "uniformity clause." *See e.g., New Jersey State League of Municipalities v. Kimmelman,* 105 *N.J.* 422, 522 *A.*2d 430 (1987); *Robinson, supra,* 69 *N.J.* at 473, 355 *A.*2d 129. The second paragraph the Court has termed the "exemption clause." See *Morristown, supra,* 124 *N.J.* at 612, 592 *A.*2d 216.

In *New Jersey State League of Municipalities,* Justice O'Hern provided what is to date the Court's most thorough discussion of the history of the uniformity clause. There, Justice O'Hern noted "two distinct components" to the uniformity clause: (1) all property must be taxed by the State according to general laws and uniform rules, and (2) all real property must be assessed at the same standard of value and at the general rate of the taxing district for its use. 105 *N.J.* at 427–28, 522 *A.*2d 430. Regardless of the political subdivision within New Jersey that levies them, all taxes are State taxes. *Id.* at 429, 522 *A.*2d 430. Exceptions to the provisions of the uniformity clause are delineated in the exemption clause.

The Court, however, has declined to take the listing of the exemption clause literally (i.e., confined to property used exclusively for religious, educational, charitable, or cemetery purposes, by non-profit organizations), and instead has looked to "whether the exemption is based on a permissible classification and if so, whether the classification serves a public purpose." *Morristown, supra,* 124 *N.J.* at 614, 592 *A.*2d 216. Accordingly, any determination of whether a statute violates article VIII of the State Consti-

tution must first look to whether real property is being taxed at nonuniform rates within a taxing district; and, if so, whether the property exempted from taxation falls within the constitutionally recognized-exceptions of the exemption clause.

Both the trial court and the Appellate Division found *N.J.S.A.* 18A:54–37 to have violated the uniformity clause, although for different reasons. *supra,* 255 *N.J.Super.* at 669, 605 *A.*2d 1151. On the one hand, the trial court saw the statute as exempting Bayonne property owners from that portion of the Hudson County property tax used to support HCVS. Finding no rational basis for the population and longevity requirements of the statute, the trial court concluded that the exemption was based on the "mere incidence of location." Relying on *League of Municipalities, supra,* 105 *N.J.* at 429, 522 *A.*2d 430, it held that the statute violated the uniformity clause. The trial court believed that an exemption from taxation could be justified only on the basis of the *use* of the property.

The Appellate Division, on the other hand, did not see the statute as exempting Bayonne's real property from taxation. 255 *N.J.* at 669, 605 *A.*2d 1151. The Appellate Division reasoned that "we are not dealing with an exception of real property from taxation; we are dealing with a lack of uniformity caused by excusing a taxpayer (Bayonne) from having to pay its proportionate share of the cost of an item in the budget of the taxing district (Hudson County)." *Ibid.* On those grounds, the Appellate Division concluded that *N.J.S.A.* 18A:54–37 violated the uniformity clause.

Intrinsic to that holding by the Appellate Division was the conclusion that a county is a "taxing district" for the purposes of article VIII. For that conclusion, the Appellate Division relied on this Court's holding in *Robinson v. Cahill,* 62 *N.J.* 473, 303 *A.*2d 273 (1973). In *Robinson,* the Court considered an equal-protection challenge to the financing of public elementary and secondary schools. In resolving that issue, the Court also considered whether the uniformity clause requires a tax levied to finance public schools to fall uniformly on all taxable property throughout the

state. In holding that a property tax designed to finance a State service must fall on all taxable property within the state, the Court held: "[I]f the responsibility for the State function is assigned to local government, the local tax must fall uniformly upon all taxable property within the *county or the municipality.*" *Id.* at 503, 303 *A.*2d 273. The Appellate Division understood that statement from *Robinson* to demand that "[t]he clause applies to all levels of state government, including counties." 255 *N.J.Super.* at 668, 605 *A.*2d 1151.

A careful review of the history of article VIII and the decisions of our courts on the uniformity clause leaves us with grave reservations about that conclusion.

The definition of "taxing district" as a political division "less than a county" was well established by both the Legislature and the judiciary at the time the 1947 Constitutional delegates began their work. The Legislature, by *L.*1918, *c.* 236, defined "taxing district" (as that term was then used in the tax assessment-collection statute) as "every political division *less than a county* whose inhabitants, governing body or officers have the power to levy taxes." (emphasis added). That definition of "taxing district" is now codified at *N.J.S.A.* 1:1–2.

The 1918 Legislative definition of "taxing district" as less than a county was itself merely a codification of a definition that had been promoted by courts as early as 1907. At that time, the Supreme Court in *Essex County Park Commission v. West Orange,* 75 *N.J.L.* 376, 379, 67 *A.* 1065 (Sup.Ct.1907), *rev'd on other grounds,* 77 *N.J.L.* 575, 578, 73 *A.* 511 (E. & A.1909), analyzed the words of a 1903 supplemental tax law that exempted "the property * * * of the State of New Jersey and of the respective counties, school districts and taxing districts, when used for public purposes." The court held that

[s]ince in this state taxing districts are coterminous with the political divisions generally known as municipal corporations ... the words "all lands the property of any taxing district," as used in the act, import the ownership of the property by some municipal corporation whose territory is *less extensive than a county.*

[75 *N.J.L.* at 379, 67 *A.* 1065.]

The Court of Errors and Appeals later reaffirmed the principle that "[a] county is not a taxing district." 77 *N.J.L.* at 578, 73 *A.* 511.

During the 1947 Constitutional Convention, the term "taxing district" was rarely mentioned and never defined on the record. *E.g.,* 5 *Convention Record* 773, 854–55. Only once were the words "taxing districts" and "counties" mentioned together, and here a distinction was drawn between the two. That occurred when a representative of the New Jersey Committee for Constitutional Revision complained about the "utter lack of equalization, not only between taxing districts and counties, but between individual properties in the same taxing district." 5 *id.* at 740. The history of the 1947 tax clause thus indicates that the Constitutional Convention delegates commonly understood the phrase "taxing district" to be a municipality.

More recent caselaw supports the contention that the term "taxing district," as used within the uniformity clause, refers to municipalities. In *League of Municipalities, supra,* for example, Justice O'Hern concluded that the uniformity clause was written "with the apparent purpose of providing that real property dedicated to *municipal tax purposes* should never be taxed at an unequal burden." 105 *N.J.* at 436, 522 *A.*2d 430. (emphasis added). See also *Sea Bright Borough v. Department of Educ.,* 242 *N.J.Super.* 225, 228, 576 *A.*2d 331 (App.Div.) (holding constitutional requirement of uniform tax rate not applicable to allocation of costs among constituent members of regional school district), *cert. denied* 127 *N.J.* 320, 604 *A.*2d 596 (1990); *Township of Princeton v. New Jersey Dep't of Educ.,* 163 *N.J.Super.* 389, 397, 394 *A.*2d 1240 (App.Div.1978) (same).

We should also note that even *Robinson,* the case on which the Appellate Division relied for its conclusion that a county was a taxing district, when describing the purpose of the uniformity clause a few pages after the dicta quoted by the Appellate Division stated that the purpose of the clause "was to assure that all

taxable property *within a municipality* shall bear the same share of the tax burden of that municipality." 62 *N.J.* at 505 (emphasis added).

### III

In holding *N.J.S.A.* 18A:54–37 unconstitutional as special legislation in violation of article IV, section 7, paragraph 9(6), we are presented with the question of appropriate relief from the two-tiered system of county taxation that was used to implement the tax exemption statute.

In its original complaint, Secaucus challenged only the application of the two-tiered system of taxation, by which HCBT implemented *N.J.S.A.* 18A:54–37, to the added and omitted assessments. As the Appellate Division explained:

Secaucus contended only that there was no need to apply the upper-tiered rate when taxing added and omitted assessments because that levy was made after the county vocational school district budget had been fully funded by the regular tax levy for that year.

[255 *N.J.Super.* at 670–71, 605 *A.*2d 1151.]

On April 16, 1987, the trial court directed that taxes collected from added and omitted assessments be used to reduce the vocational-school budget. The purpose of that order was to provide a credit to the municipalities that paid the upper-tier tax imposed by HCBT. Subsequently, Secaucus was given leave to amend its complaint to allege that *N.J.S.A.* 18A:54–37 was unconstitutional and to join other necessary parties. The matter was reversed and remanded to the trial court.

In its June 29, 1990, decision, the trial court granted relief to Secaucus and "similarly situated Hudson County municipalities by application of excess two-tiered payments to the [HCVS] budget commencing with the year subsequent to the filing of the original complaint in 1986." The trial court granted full relief from *N.J.S.A.* 18A:54–37 by the elimination of the two-tiered county rate in 1990. Thus the remedy ordered by the trial court incorporated the relief granted Secaucus and similarly situated municipal-

ities for the period extending from April 1986 (the filing of the original complaint) to May 1988 (the date on which Secaucus first raised constitutional issues in its amended complaint).

Bayonne urges that should the statute be declared invalid, any financial relief to be granted to Secaucus and similarly-situated municipalities should relate only to the 1989 tax year and thereafter. The partial remedy ordered by the trial court, which the Appellate Division affirmed, is deemed by Bayonne to be impermissible retroactive relief.

The Appellate Division rightly rejected that argument. 255 *N.J.Super.* at 670–71, 605 *A*.2d 1151. The partial judgment of the trial court, as the Appellate Division noted, "simply preserves the relief for that period given the non-Bayonne municipalities in the first judgment. That relief is not retroactive to the complaint." *Id.* at 671, 605 *A*.2d 1151.

Accordingly, we affirm the judgment of the Appellate Division that HCBT should debit Bayonne and credit the remaining Hudson County municipalities the appropriate added and omitted assessments for the period from 1986 to May 27, 1988, and for the 1989 tax year. To ease the burden on Bayonne, we modify the Appellate Division decision to direct HCBT to calculate the appropriate debits and credits and implement them on a pro-rated basis over a reasonable period of time. We further affirm the elimination of the two-tiered Hudson County tax rate that was ordered in 1990.

STEIN, J., dissenting.

In enacting *N.J.S.A.* 18A:54–37 the Legislature apparently was attempting to spare the City of Bayonne financial responsibility for a vocational school its students would not attend. Bayonne has maintained its own high-quality vocational-educational program since 1931. For Bayonne students, the Hudson County vocational program, established in 1972, was a duplication of effort; for Bayonne taxpayers, it was a duplication of expense.

By concluding that *N.J.S.A.* 18A:54–37 offends the constitutional prohibition on special legislation relating to taxation, the majority unnecessarily interferes with the Legislature's authority to balance competing municipal interests. Because the majority overlooks the well-established principles governing this Court's consideration of special legislation, I dissent from so much of the Court's judgment as holds the statute to be unconstitutional special legislation. I would uphold the validity of the statute.

I.

*N.J.S.A.* 18A:54–37 provides:

Notwithstanding any of the provisions of chapter 54 of Title 18A of the New Jersey Statutes, in any county of the first class having a population of not more than 700,000 according to the latest federal decennial census, each municipality included within a school district which has maintained for a minimum of 20 years a vocational education program approved for the purposes of federal or State allotment of vocational funds by the Commissioner of Education under the regulation of the State Board of Education shall be exempt from assessment, levy or collection of taxes based on any apportionment of amounts appropriated for the use of a county vocational school district.

Plaintiffs allege that that statute violates the constitutional mandate that "[t]he Legislature shall not pass any private, special or local laws: * * * Relating to taxation or exemption therefrom." *N.J. Const.* art. IV, § 7, ¶ 9(6). The principles generally applicable to challenges addressed to the constitutionality of statutes likewise guide our consideration of a claim that a statute violates the special legislation prohibition.

That "[a] statute is presumed to be constitutional and will not be declared void unless it is clearly repugnant to the Constitution," *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222, 486 *A.*2d 305 (1985), is well-established. When a statute is susceptible of more than one interpretation, courts favor an interpretation sustaining its constitutionality. *In re Loch Arbour,* 25 *N.J.* 258, 264–65, 135 *A.*2d 663 (1957). Furthermore, a party challenging the validity of a statute under the special-legislation prohibition of article IV has the burden of demonstrating clearly

the constitutional violation. *Newark Superior Officers Ass'n, supra,* 98 *N.J.* at 222, 486 *A.*2d 305.

In *Vreeland v. Byrne,* 72 *N.J.* 292, 298–301, 370 *A.*2d 825 (1977), we established a three-part test to determine whether a statute is unconstitutional special legislation. We first consider the purpose of the law in question. Next, we apply the law to the factual context to determine whether exclusions from the statute's applications can be identified. Finally, we determine whether a rational basis exists that is related to the object of the statute on which the exclusion or classification may rest. *Ibid.* In ascertaining whether such a rational basis exists, we are not "limited to the stated purpose of the legislation, but should seek *any* conceivable rational basis." *Township of Mahwah v. Bergen County Bd. of Taxation,* 98 *N.J.* 268, 286, 486 *A.*2d 818, *cert. denied sub nom. Borough of Demarest v. Township of Mahwah,* 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985).

In *Vreeland, supra,* that test guided our consideration of the validity of a statute that increased the salaries of Associate Justices of the Supreme Court but denied that increase to any member of the Legislature who might be appointed to the Court after enactment of the salary increase and during the term for which he or she had been elected to serve in the Senate or General Assembly. The Court first determined that the sole purpose of the statute was to increase judicial salaries. 72 *N.J.* at 298–99, 370 *A.*2d 825. The Court then inquired whether "there are persons similarly situated to those embraced within the act, who, by the terms of the act, are excluded from its operation." *Id.* at 299, 370 *A.*2d 825. Any member of the Legislature who might succeed to a vacancy on the Court was excluded by the terms of the statute. *Ibid.* In considering whether some rational basis existed for that exclusion, the Court concluded that "[i]t would be fatuous to suggest that distinctions exist among the Associate Justices of the Court such as to justify a salary differential." *Id.* at 300, 370 *A.*2d 825. Having found no rational basis for the exclusion, and concluding that "the legislative intent [would] be more nearly realized by exscinding this provision than by declar-

ing the entire statute unconstitutional," *id.* at 301, 370 *A.*2d 825, the Court excised the arbitrary classification from the statute. *Ibid.*

In *Newark Superior Officers Ass'n, supra,* 98 *N.J.* 212, 486 *A.*2d 305, we applied the *Vreeland* test to a statute that permitted mayors of first-class cities having a "Mayor–Council Plan C" form of government to appoint police chiefs to unclassified civil-service positions. We first determined that the object of the legislation was to provide for greater cooperation between a police chief and the administration of cities of the first class. *Id.* at 224, 486 *A.*2d 818. We then observed that the statute was applicable only to Newark and Jersey City and that the population requirement of the statute acted to exclude all other cities. *Ibid.* Acknowledging the nexus between accountability and population, and drawing on earlier judicial recognition of the validity of population classifications, we concluded that the exclusions created by the statute were rationally based. *Id.* at 225–28, 486 *A.*2d 818.

We explained in *Newark Superior Officers Ass'n* that "in deciding whether an act is special or general legislation, the determining factor is what is excluded and not what is included." *Id.* at 223, 486 *A.*2d 818. We also emphasized our focus on statutory exclusions in *Paul Kimball Hospital, Inc. v. Brick Township Hospital, Inc.,* 86 *N.J.* 429, 432 *A.*2d 36 (1981), in which we observed that "the particular determinant of a special law is the appropriateness of the objects which it excludes." *Id.* at 445, 432 *A.*2d 36. The principles generally applicable to equal-protection analysis similarly are applicable to a consideration of the propriety of a statutory exclusion. *Id.* at 445, 432 *A.*2d 36. Thus, we noted in *Paul Kimball Hospital* that

the Legislature has wide discretion in determining the perimeters of a classification, distinctions may be made with substantially less than mathematical exactitude, and an adequate factual basis for the legislative judgment is presumed to exist. We must also be mindful of the strong presumption in favor of constitutionality, and the traditional judicial reluctance to declare a statute void, a power to be delicately exercised unless the statute is clearly repugnant to the Constitution.

[*Id.* at 446–47, 432 *A.*2d 36 (citations omitted).]

Our adjudication of a special-legislation challenge must proceed in accordance with those principles. Generally, we uphold the constitutionality of a statute unless the party challenging the statute can demonstrate that no rational basis exists to support the exclusionary classification. *Newark Superior Officers Ass'n, supra,* 98 *N.J.* at 222–23, 486 *A.*2d 305.

## II.

The object of *N.J.S.A.* 18A:54–37 is threefold. First, the statute spares municipalities that maintain a vocational program that has been approved for federal or State funding for at least twenty years and are located in large, densely-populated counties the financial burden of contributing to the funding of a county vocational program. In turn, that exemption serves as an incentive to those municipalities to preserve the quality of their vocational programs and to continue their operation. Finally, the availability to municipal residents of a high-quality vocational program renders them less likely to attend a county vocational program. Their attendance at the local vocational school reduces to some extent the demand for admission to a vocational-school program operated by a first-class county.

We next consider which, if any, municipalities are excluded from the statute's scope and whether that exclusion is rationally based. The statute requires that in order to be eligible for the exemption, a municipality must maintain a vocational program that is approved for State or federal funding. Funding may be withheld from local vocational programs that do not meet the standards established by the State Board of Education and the United States Department of Education. *See generally N.J.A.C.* 6:43–2.1 to 3.19. Unquestionably, a rational basis existed for the Legislature to have selected only those municipalities with comprehensive, regulated vocational programs to be included in the class exempted from participating in the funding of county vocational programs.

Further emphasizing the importance of vocational programs of established quality, the statute also requires that the program have been in existence for at least twenty years. That limitation necessarily excludes from the scope of *N.J.S.A.* 18A:54–37 all vocational-school programs that have been operating for fewer than twenty years. Surely, the Legislature could have designated a period shorter than twenty years as the standard for assuring that a vocational-school program is sufficiently well-established to merit the tax exemption for its municipality, but we need not second-guess the rational legislative decision that only programs operating twenty years or more demonstrate the required measure of quality and durability.

The statute also excludes from the class any municipality not located in a first-class county. Bergen, Essex, and Hudson are the only first-class counties in New Jersey. Thus, only municipalities in those counties are eligible for the *N.J.S.A.* 18A:54–37 exemption. First-class status is determined by the population and density of the county. As noted earlier, "A classification based on population does not automatically render a law unconstitutional special legislation." *Newark Superior Officers Ass'n, supra,* 98 *N.J.* at 225, 486 *A.*2d 305. Because first-class counties have the largest population and the largest vocational-student population, the potential for overcrowding of county-vocational programs may be greater in first-class than in other counties, arguably prompting the Legislature to focus its attention on encouraging municipal vocational-school programs in first-class counties. Although a need for municipally-operated vocational schools may exist in other than first-class counties, we should not condemn as irrational the Legislature's determination to restrict the tax exemption only to municipalities in first-class counties. *See Mahwah, supra,* 98 *N.J.* at 289–90, 486 *A.*2d 818 (emphasizing that "in population classification cases, legislative bodies may undertake the progressive resolution of problems dealing first with those aspects that are most pressing").

The classifications thus far described narrow eligibility of municipalities to those located in a first-class county that have

maintained an approved vocational program for at least twenty years. The list of approved vocational programs reveals that no municipality either in Bergen or Essex Counties maintains such a program. Bayonne has maintained its program for over twenty years.

*N.J.S.A.* 18A:54–37 is further limited to municipalities in first-class counties with a population of not more than 700,000. That limitation does not exclude any municipality from the benefits of the statute because no municipality in a first-class county with a population exceeding 700,000 has maintained an approved vocational program for twenty years or more. The population of Hudson County is less than 700,000. Because we look to what is *excluded* and not what is included, we need not determine the rationality of the population cap because it has no effect. As noted in *Mahwah, supra,* "While we might not agree that the population line should have been drawn where it has been, we submit that that determination is a legislative function subject to many considerations beyond the purview of this Court." 98 *N.J.* at 291, 486 *A.*2d 818; *see also State ex rel. Owens v. Fury,* 55 *N.J.L.* 1, 25 *A.* 934 (S.Ct.1892) (upholding statutory classification that excluded all cities with populations below 50,000 or above 100,000).

Even if the population ceiling were to exclude a municipality that is otherwise similarly situated, the Court could invalidate that ceiling and sever it from the balance of the statute, rather than conclude that the statute is unconstitutional as special legislation. Because the 700,000 population ceiling excludes no qualifying municipalities from the statute's coverage, the Legislature clearly would prefer its excision to complete invalidation of the exempting statute. *See Mahwah, supra,* 98 *N.J.* at 294–95, 486 *A.*2d 818 (preserving statute's constitutionality by severing grandfather clause that would render statute special legislation); *Vreeland, supra,* 72 *N.J.* at 301, 370 *A.*2d 825 (finding legislative intent more nearly realized by excising irrational statutory classification than by declaring statute unconstitutional).

The rationally-based classifications in *N.J.S.A.* 18A:54–37 operate to exclude all municipalities except Bayonne. That a statute operates in favor of only one municipality does not render that statute invalid. *Mahwah, supra,* 98 *N.J.* at 285, 486 *A.*2d 818. When a statute addresses the needs of a specific community, the Court should consider whether "other municipalities could, and from time to time have, come within its scope." *Ibid.* Other municipalities may become eligible for the exemption provided by *N.J.S.A.* 18A:54–37; for example, Kearny will be eligible for the statutory exemption in the year 2000.

### III.

The majority concludes that "*N.J.S.A.* 18A:54–37, as it actually operates does not represent a reasonable legislative classification." *Supra* at 501, 628 *A.*2d at 298. In reaching that conclusion, the majority overlooks the direction of *Newark Superior Officers Ass'n, supra* 98 *N.J.* at 222, 486 *A.*2d 305, that courts should not substitute their judgment for that of the Legislature in determining whether a legislative classification is rational. "If we can conceive of any reason to justify the classification, the statute will be upheld." *Id.* at 227, 486 *A.*2d 305. The majority offers several justifications for the statutory classifications. For example, the majority states that "it is possible to conjecture that the Legislature had a special interest in encouraging the development of local vocational education programs in the State's most densely-populated areas." *Supra* at 497, 628 *A.*2d at 296. Nevertheless, the majority concludes that that possibility is remote. *Ibid.* Our prior holdings emphasize, however, that if "*any* conceivable rational basis," *Mahwah, supra,* 98 *N.J.* at 286, 486 *A.*2d 818, exists to justify a statutory classification, the Court must uphold that statute. *Id.* at 285–86, 486 *A.*2d 818; *Vreeland, supra,* 72 *N.J.* at 301, 370 *A.*2d 825. As we explained in *Newark Superior Officers Ass'n, supra:*

> Ultimately, the generality or speciality of a statute becomes a question of reasonableness. There is no general rule to distinguish a reasonable from an unreasonable classification, the question being a practical one varying with the facts in each case. As stated previously, where the question of reasonableness is fairly debata-

ble, courts will uphold the classification. The burden of showing that the classification is not reasonable is upon the party attacking the statute. If we can conceive of any reason to justify the classification, the statute will be upheld.

[98 *N.J.* at 227, 486 *A.*2d 305]

Because I believe that the reasonableness of the classifications in *N.J.S.A.* 18A:54–37 are, at the very least, "fairly debatable," I would uphold the validity of the statute.

*For modification and affirmance*—Chief Justice WILENTZ and Justices HANDLER, CLIFFORD, POLLOCK and GARIBALDI—5.

*For reversal*—Justices STEIN and O'HERN—2.